STEPHENS FUEL CO., Inc., et al. v. BAY PARKWAY NAT. BANK OF BROOKLYN IN NEW YORK et al.

No. 149.

Circuit Court of Appeals, Second Circuit.

Jan. 22, 1940.

Reuben B. Shemitz, of New York City, (Meyer William Ross, of New York City, of counsel), for defendants-appellants Samuel W. Ascher et al.

Isaac N. Jacobson, of New York City, (Irving Meister, of New York City, of counsel), for defendant-appellant Samuel H. Draisin.

Karl Propper, of New York City, for complainant-appellee Stephens Fuel Co., Inc.

Walter Jeffreys Carlin, of New York City (Walter Jeffreys Carlin and Paul C. Werner, both of New York City, of counsel), for complainant-appellee Lafayette Nat. Bank.

Max Rockmore, of New York City, defendant-appellee, in pro. per.

Before SWAN, AUGUSTUS N. HAND and PATTERSON, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This suit was brought by Stephens Fuel Co., Inc. (which had recovered a judg-

ment for $3,410.86 against the defendant Bay Parkway National Bank) to enforce the statutory liability of the stockholders of such bank pursuant to the provisions of Title 12, Chapter 2, § 65 U.S.C.A.

Section 65 provides that: "When any national banking association shall have gone into liquidation under the provisions of section 181 of this title, the individual liability of the shareholders provided for by section 63 of this title may be enforced by any creditor of such association, by bill in equity, in the nature of a creditor's bill, brought by such creditor on behalf of himself and of all other creditors of the association, against the shareholders thereof, in any court of the United States having original jurisdiction in equity for the district in which such association may have been located or established."

Section 63 provides that: "The shareholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares * * *".

Section 64 also imposes a similar liability upon "stockholders * * * who shall have transferred their shares or registered the transfer thereof within sixty days next before the date of the failure of such association to meet its obligations, or with knowledge of such impending failure * * *."

Section 181 permits a national bank to "go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock."

About the middle of March 1931, because of the general financial crisis, a run started on the Bay Parkway National Bank which resulted in negotiations between its officials and those of Lafayette National Bank whereby the latter should take over the Bay Parkway assets and liquidate them. The negotiations resulted in an agreement under date of March 31, 1931 between Bay Parkway and Lafayette which recited that it was the opinion of the directors of Bay Parkway and of stockholders owning more than two-thirds of its capital stock that it would be advantageous to Bay Parkway and its stockholders to discontinue operations through liquidation and that the directors and more than two-thirds of the stockholders had authorized the making of the contract between the

two banks. The agreement purported to set forth a statement of the assets and liabilities of Bay Parkway and contained a warranty that the liabilities set forth were all its obligations. Lafayette agreed to assume and pay the enumerated obligations of Bay Parkway to the amount of $1,087,598.51 and Bay Parkway to deliver its promissory note to Lafayette for that amount payable with six per cent interest one year from date and to assign all its property as security for the payment thereof. Lafayette agreed to realize on the collateral and to credit the proceeds against the note. Bay Parkway ceased to do business after the execution of the agreement and has done none since.

Pursuant to the agreement we have described, Lafayette proceeded to liquidate the collateral but after liquidation there remained due from Bay Parkway on the note a large balance which on December 7, 1938 amounted to $164,054.74.

The arrangement for voluntary liquidation closely resembles the one sustained by the Circuit Court of Appeals of the Seventh Circuit in Pickett v. Trixler, 93 F.2d 178.

The claim of Stephens Fuel Co., Inc., was not listed in the agreement of March 2, 1931, among the liabilities of Bay Parkway. Because of this, Lafayette declined to pay the claim and Stephens Fuel Co., Inc. brought the present suit to enforce the statutory liability imposed on the stockholders of Bay Parkway under Section 65 of the National Banking Act. Lafayette thereafter intervened in the suit to assert its rights as a creditor.

The defendants who have resisted the claims of Stephens Fuel Co. Inc., and Lafayette principally contend that there was no voluntary liquidation of Bay Parkway under Section 181 for the reason that two-thirds of its stockholders never consented to such form of liquidation.

The defendant Samuel Draisin has interposed a defense to the suit in addition to that of failure to procure the consent of two-thirds of the stockholders to a voluntary liquidation. This additional defense is based on his claim that he sold his stock on March 30, 1931, before any consent to voluntary liquidation took place and at a time when he had no knowledge of impending insolvency of the bank. The trial court overruled this defense.

The District Judge referred to a Special Master the question whether the court had

jurisdiction to entertain the suit because of an alleged lack of consent to the liquidation by the requisite two-thirds of the stockholders as prescribed by Title 12, Section 181, U.S.C.A. of the National Banking Act. The Special Master reported that two-thirds of the stockholders had not consented. Upon a hearing of exceptions to the report the exceptions were sustained by the court, the report was disaffirmed and a decree passed adjudging the defendants liable to the statutory assessments claimed. We hold that the decree was proper and should be affirmed.

█ The execution of the agreement of March 31, 1931, was authorized by the Board of Directors of Bay Parkway and notices of a meeting of the stockholders to ratify the agreement and to take action for placing the bank in voluntary liquidation were duly mailed. The stockholders' meeting was held on May 28. The evidence adduced at the trial clearly showed that more than two-thirds of the stockholders voted for the liquidation of the bank, that a liquidation committee was appointed pursuant to the requirements of Section 181 and that the acts of the officers and directors in entering into the contract of March 31, 1931 were "ratified, confirmed and approved". The minutes of the meeting recited that 1,574 shares were present by proxy and 12 others in person, and that the resolutions were unanimously carried except for the vote of Mr. S. Duberstein who asked for an adjournment but did not cast an adverse vote. The total amount of stock issued and outstanding was 2,000 shares, of which 1,576 shares are shown to have voted in favor of the resolutions. It is thus apparent that far more than the requisite two-thirds of the stockholders acted in favor of voluntary liquidation and ratified the contract with Lafayette.

The proxies already mentioned as well as certain consents of the stockholders of Bay Parkway signed by them shortly before the execution of the contract of March 31, 1931, provided for a voluntary liquidation of Bay Parkway, for the transfer of its assets to Lafayette upon the assumption of its liabilities by the latter and for the execution by the officers of any contract or other instrument relating to the proposed liquidation.

█ There can be no doubt that the corporate records in which the resolutions of the directors and stockholders are contained are in themselves proof of the regularity of the transactions recorded therein and that the defendants have the burden of meeting that proof. Sigua Iron Co. v. Brown, 171 N.Y. 488-496, 64 N.E. 194; Matter of Mandelbaum, 80 Misc. 475-477, 141 N.Y.S. 319, affirmed, 159 App.Div. 909, 144 N.Y.S. 1128. Proxies relied on at the meeting are entitled to the same presumption. People ex rel. Chritzman v. Crossley, 69 Ill. 195; Gentry-Futch Co. v. Gentry, 90 Fla. 595, 106 So. 473. The defendants have attempted to rebut by offering evidence in order to show that the signatures on the proxies running to Kennedy, Feely and Sampson were signed without authority, at least to an extent sufficient to invalidate the two-thirds vote.

█ Appellants' counsel argues that the the name of Naomi Cowen, the owner of 50 shares, was signed by her husband but, when called as a witness, it was not shown that she did not authorize him to represent her in matters relating to the liquidation, or ratify his act. He only said that he signed her name to the proxy without her "specifically" authorizing him "to sign that signature". A similar contention is made as to the signatures of Pauline Nasser and Samuel Nasser whose signatures are claimed to have been inserted by N. Nasser, another stockholder. Here again there was no proof that the signatures of Pauline Nasser and Samuel Nasser, who owned an aggregate of six shares, were unauthorized. The same thing is true in the case of Hyman Smith and Goldie Smith, who together owned three shares, and Mary Turkahy, who owned one. The six signatures preceding that of Mary Turkahy of persons owning 19 shares in the aggregate were subjected to the same criticism but are not shown to have been invalid since there was no proof that they were not authorized. The attack upon many other signatures by defendants' counsel must fail for the same reason.

There is testimony that the signature of J. J. Blank representing 10 shares and that of his father A. Blank representing 15 shares are not authentic and for present purposes we may exclude these 25 shares from the count. Harry Horowitz testified that he owned four shares, one in his own name, one in the name of his wife Anna, one in the name of his son Irving and one in the name of his son Samuel. He denied that any of the four signatures was gen-

uine and we may accordingly disregard them for purposes of computation. There is testimony by Henry Goldstein that the signature of Ernestine Goldstein, who owned 5 shares, was not genuine, but neither Ernestine nor her husband was called as a witness and there was no proof that her signature, whoever made it, was not authorized.

■ Even if we exclude the signatures of Joseph Blank and his father; Harry Horowitz, his wife and two sons, and Ernestine Goldstein (and we can see no justification for excluding the latter's signature) there would be a total of but 34 signatures to be disregarded in arriving at a correct computation of votes cast. There would still be far more than two-thirds of the signatures that would be unassailable.

■ Defendants' counsel likewise make the further contention that the signature of Bay Parkway Corporation, a holder of 304 shares, which was made by its president Mr. Bond, was not authorized because he had not been empowered to sign by a directors' meeting. But the directors of the Bay Park Corporation and the Bay Parkway National Bank were the same persons and in view of the circumstances it is quite unlikely that the president lacked authority to sign the proxy and consent of Bay Parkway Corporation to the liquidation of Bay Parkway National Bank.

■ It is also argued that the proxies were invalid because the names of the persons designated as attorneys therein were not inserted until after the proxies were signed. This contention is without merit for there was an implied power to fill in the blank and a presumption that the names were inserted with the authority of the maker. White v. New York State Agricultural Society, 45 Hun 580; Sadgrove v. Bryden [1907] 1 Ch. 318; Ernest v. Loma Gold Mines Ltd. [1897] 1 Ch. 1.

■ In any event the stockholders of Bay Parkway were estopped from questioning the validity of the contract between Bay Parkway and Lafayette. Lafayette advanced large sums of money and assumed liabilities upon the faith of corporate action that seemed regular on its face. More than two years elapsed without protest from a single stockholder and only when an assessment was attempted was any objection made to the procedure adopted. The stockholders were all given notice of the stockholders' meeting called for the purpose of authorizing a liquidation and ratifying the execution of a contract which involved large advances and obligations on the part of Lafayette, and the statutory notice of the liquidation was published pursuant to Section 182, Title 12 U.S.C.A. In these circumstances the stockholders were estopped from questioning the transactions, as the court below properly held. Wannamaker v. Edisto Nat. Bank of Orangeburg, 4 Cir., 62 F.2d 696, 700; Dold Packing Co. v. Doermann, 8 Cir., 293 F. 315, 329-330.

■ The defendant Draisin has appealed from the decree on the additional ground that he sold his ten shares of stock at $45 per share the day before Bay Parkway was closed. This sale is claimed to have been an over-the-counter sale to a firm of brokers who said they sold the shares to one Gertrude Gordon, who was not one of their customers and was not produced as a witness. Instead of obtaining any information about the value of, or trades in the stock, or seeking the advice of a broker, Draisin asked a lawyer named Newman to sell his shares for him. Newman took him to the office of the brokers who are said to have made the sale. Draisin admitted that the day before the sale he heard that "Lafayette Bank had bought out the Bay Parkway" and the shares were never transferred to the name of the purchaser and could not be, for the transfer books were closed because Bay Parkway had ceased doing business. Indeed there was no proof that Draisin received any money for his shares.

The whole story of the sale of the stock seems "fishy" and its lack of verisimilitude justified the finding of the court below that "Draisin is still the equitable holder and owner".

■ Irrespective, however, of the merits of Draisin's proof, it is plain that if he disposed of his stock he did so at a time when Bay Parkway was selling out its business to Lafayette and when financial conditions in New York were notoriously bad. Under such circumstances it seems most improbable that Draisin did not know that there was a run on the bank and that the directors were gathering consents for the proposed voluntary liquidation, or that he was not aware of its "impending failure". Accordingly he was liable

to an assessment as provided in Sections 63, 64 and 65.

Decree affirmed.