BOUDINOT ATTERBURY and PHILIP L. CARRET,

*vs.*

CONSOLIDATED COPPERMINES CORPORATION, a corporation
of the State of Delaware, I. W. BURNHAM, II, NORMAN
E. LAMOND, CLAUDE F. LEAMAN and JOHN A. PAYNE.

*New Castle, June 26, 1941.*

4

*Caleb S. Layton,* of Richards, Layton & Finger, and Neil P. Cullom and James E. Freehill, both of New York City, for petitioners.

*Clarence A. Southerland* and *Paul Leahy,* of Southerland, Berl, Potter & Leahy, and Leo Gottlieb and Rupert Warren (of Root, Clark, Buckner & Ballantine), both of New York City, for respondents.

*Chester T. Lane, Christopher M. Jenks, John F. Davis,* and *John W. Christensen,* all of Washington, D. C., *amicus curiae,* for Securities and Exchange Commission.

THE VICE-CHANCELLOR: The petitioners charge that the purported election of directors at the stockholders' meeting of 1940 was invalid because a quorum was not present at the meeting. To support this they would show that proxies were obtained by fraud, revocations of proxies were not recognized, proxies which were invalid were voted, and shareholders counted as present in person did not attend the meeting.

The petitioners, Boudinot Atterbury and Philip L. Carret, are shareholders and were formerly president and vice-

president, respectively, of the corporation. In March, 1940, they made a report to the directors concerning certain employees of the company at a mine operated by it, and made charges against these employees. The board of directors appointed a special committee to investigate the charges and to inform the directors of the committee's findings. On May 3, 1940, the committee made a report to the board which, in substance, exonerated the employees in question and criticized the petitioners for their action in the matter. On May 6, the day preceding the annual meeting of stockholders, the directors granted to the petitioners leaves of absence with pay pending the expiration of their terms of office, and temporarily vested the powers of president in I. W. Burnham, II, a director of the corporation, as vice-president and acting president.

On March 15, 1940, at the same meeting at which the special investigating committee was appointed, the board of directors, by the unanimous vote of its fifteen members, including the petitioners herein, adopted a resolution authorizing "the Executive Officers" of the corporation (consisting of the petitioners herein, and E. J. MacDonald, secretary and treasurer) to prepare a notice of the annual meeting of stockholders to be held on May 7, 1940, and also to prepare "on behalf of the Management" a proxy and proxy statement to be forwarded with the notice to all stockholders of record as of the close of business on April 16, 1940. The resolution further appointed a proxy committee consisting of the petitioner Atterbury and two other directors, namely, Edwin L. Derby, Jr., and Duncan M. Spencer, and instructed such committee "to vote such proxies as may run to them for the election as Directors of this Corporation of such candidates for that office as are designated by this Board of Directors."

At the same meeting, the directors also adopted a resolution naming I. W. Burnham, II, Philip L. Carret (one of the petitioners herein), Norman E. LaMond, Claude F. Lea-.

man and John A. Payne as "the Management's nominees as candidates for directors to hold office for three years." These persons were incumbent directors. Their nomination for re-election was approved unanimously by the ten disinterested directors, including the petitioner Atterbury.

The executive officers caused the notice, proxy statement, and form of proxy to be mailed to stockholders.

Some days prior to the annual meeting, petitioners sought to obtain revocations of proxies in order to prevent the attendance of a quorum at the scheduled meeting, their position being that they wished to delay the meeting until they might have an opportunity to inform the shareholders concerning the affair at the company's mine. Petitioners communicated with numerous stockholders requesting them to revoke their proxies previously sent to the proxy committee. Many proxies were revoked.

On May 7 at 1 P. M. the annual meeting was called to order by respondent, Burnham, as acting president. Spencer and Derby, comprising a majority of the members of the proxy committee, were in attendance at the meeting. After recesses, the meeting was adjourned to the morning of May 8 when the inspectors reported that a quorum was not present on the preceding day. The meeting was then adjourned, pursuant to Article 1, Section 4 of the by-laws, the second paragraph of which provides:

"If the holders of the amount of stock necessary to constitute a quorum shall fail to attend in person or by proxy at the time and place fixed by these By-Laws for an annual meeting, or fixed by notice as above provided for a special meeting, a majority in interest of the stockholders present in person or by proxy may adjourn, from time to time, without notice other than by announcement at the meeting, until holders of the amount of stock requisite to constitute a quorum shall attend. At any such adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting as originally notified."

When the meeting reassembled in the afternoon, the inspectors presented an amended report in which they stated

that a quorum was, in fact, present on May 7. They then further reported that there was a quorum present at the afternoon session on May 8, and the meeting proceeded to the election of five directors. The present proceeding challenges the office of the directors so elected. Many questions are raised, and the more important of them will, for the sake of clarity, be dealt with separately.

1.  Fraud in the solicitation or use made of proxies.

The petitioners urge that certain statements contained in the solicitation of proxies for the annual meeting were false and misleading, and omitted to state material facts. The first such statement is the following:

"The attached proxy is solicited by the management".

Petitioners say that the solicitation was, in effect, a representation that the same officers would be retained; whereas the proxies were employed to bring about a radical change in the management. They urge that the term "management" was used in the proxy solicitations to mean "directors and officers," pointing out that the solicitation was in compliance with the Rules and Regulations of the Securities and Exchange Commission, and that Rule X-14A-8(h) of the Commission provides:

"The phrase 'the persons making the solicitation,' used in relation to a solicitation by the management of the issuer, means the directors and officers of the issuer, exclusive of any directors or officers who are opposed to the solicitation."

It seems plain that the solicitation was for proxies to be voted for five designated directors; that the solicitation itself, as well as the choice of candidates, were approved by the directors and officers when the solicitations were made; and further that the proxies were actually used to vote for these very candidates. In my view, the facts do not warrant an inference, as charged by the petitioners, that any of the directors knew, when the proxies were solicited, that the petitioners would be removed from office or would not be

re-elected. In addition, I do not find from the language of the regulations quoted, nor from the surrounding circumstances, any representation which would justify the shareholders in expecting that the directors would either continue the same persons as officers, or choose others in their stead.

Another statement contained in the proxy solicitations which petitioners consider misleading is the following:

"The only business which the management intends to present, or knows that others may present, is the election of directors".

The petitioners contend that the directors who opposed them knew that petitioners would inform the stockholders of the matters relating to their charge of improper conduct of employees at the mine, if the report of the investigating committee should not be in harmony with the position taken by petitioners with respect to this affair. They say that the report was deliberately delayed so that when made it would be too late for petitioners to communicate with the stockholders. It is a sufficient answer that the evidence wholly fails to establish either that the directors knew, at the time of the making of the proxy solicitations, what report would thereafter be made by the investigating committee, or that the making of the report was willfully delayed. I find no fraud in the solicitation of proxies nor in the voting of them at the meeting.

2. Treasury shares.

Petitioners contend that in computing the number of shares necessary to constitute a quorum, the corporation's 4,000 shares of treasury stock should be counted. The pertinent by-law provides:

" 'At all stockholders' meetings a majority of the whole outstanding capital stock of the Corporation shall constitute a quorum for all purposes of any meeting.' "

The treasury shares could not be voted, for *Section 19* of the *Delaware Corporation Law* provides that "* * *

shares of its own capital stock belonging to the corporation shall not be voted upon directly or indirectly * * *." Consequently, it would seem wholly unreasonable to count them in computing a quorum. As between the stockholders and the corporation, treasury stock, which represents no effective obligation against the corporation, is not "outstanding." *Borg v. International Silver Co.,* (2 *Cir.,*) 11 *F. 2d* 147; *Scheirich v. Otis-Hidden Co., et al.,* 204 *Ky.* 289, 264 *S. W.* 755. The expression "outstanding capital stock" as used in the by-law should be construed to mean stock in the hands of shareholders, not stock in the treasury. The case of *Italo Petroleum Corp. v. Producers Oil Corp.,* 20 *Del. Ch.* 283, 174 *A.* 276, is not opposed to this construction.

3. Proxies in which the signatures differ in some manner from the names of shareholders as registered on the corporate books.

Petitioners object for various reasons to the inspectors' inclusion of these proxies, but certain facts are applicable to all of them. They are printed cards supplied by the corporation, and mailed by it with the proxy solicitation to the shareholders registered on the corporate books. On each, a line for signature is provided, and beneath the line appears the stenciled name and address of a shareholder as these appear on the books. All of the proxies in question were received by the corporation through the mail.

Generally speaking, inspectors act properly in recognizing a proxy where, the genuineness not being otherwise assailed, enough appears from it "to give it the appearance of prima facie authenticity." *Gow v. Consolidated Coppermines Corp., et al.,* 19 *Del. Ch.* 172, 201, 165 *A.* 136, 148. A basic ground of the rule applied in that case to partnership proxies is that practicability must not be sacrificed to mere form, and that the use of proxies in corporate elections should not be hedged about by restrictions which, because of practical considerations, are almost prohibitive. In the

light of the reasoning of this authority, the specific objections made here will be tested.

One proxy bears the purported signature "Catherine Hughes," whereas the stenciled name below the signature (which is the form appearing on the corporate books) is "Catherine Hughes, Administratrix of Estate of James Hughes." The ground of objection is that the person who signed did not indicate in writing the capacity in which she signed. While it is preferable to indicate the capacity, it nevertheless seems to me that enough appears so that this proxy should be taken as presumptively genuine. The stenciled name which is below the signature does state the capacity of the shareholder, and, of course, there has been no showing that the proxy was not signed by the proper person. The same conclusion applies to the other proxies where the sole objection is the absence of any indication in writing of the signer's capacity.

Petitioners object to a proxy because it was signed by only one of two executors. The proxy was properly counted. *Sellers v. Joseph Bancroft & Sons Co.*, 25 *Del. Ch.* 268, 17 *A.* 2d 831. The cited case likewise sustains respondents' contention that the inspectors were in error in rejecting a proxy signed by one of two joint owners.

One proxy was signed "L. Dubinsky," whereas the stenciled name below the signature was "Louis Dubinsky." Certainly, the use of an initial instead of the spelling out of the Christian name did not deprive the proxy of the appearance of authenticity. Another proxy was signed "J. H. Bornman," whereas the stenciled name is "James J. Bornman." Bearing in mind that the form of proxy was mailed to the shareholder as his name and address appeared on the books, and that the same form of proxy was received back by the corporation, it seems to me that the difference in the middle initial and the initial for the full Christian name are not enough to require the inspectors to reject the proxy.

4. Objections to the counting of certain shareholders as present in person at the meeting.

Petitioners contend that the inspectors could not properly amend their report. Hence, although conceding the physical presence at the meeting of Clifton N. Bradley, Arnold Hoffman and Hazel M. Wattles, they object to the amendment of the report to include these shareholders because they were not counted in the original one. Authorities are cited for the proposition that where the inspectors have closed the polls, counted the votes and announced the result of a vote, it is then too late to open the polls and receive the votes of any who have not voted. However this may be, the inspectors' report of the existence or non-existence of a quorum is not a matter of voting or balloting. The inspectors in amending their report did not reopen, or purport to reopen, a meeting to permit more people to attend, but merely attempted to remedy what they deemed to be mistakes which they had made in counting the persons who already had been there. No valid reason appears why they should not be permitted to do this. Moreover, the essential question is whether there was a quorum at the meeting, and in a review proceeding of this character, this court may inquire into the actual facts. Compare: *Italo Petroleum Corp. v. Producers Oil Corp.*, 20 *Del. Ch.* 283, 174 *A.* 276; *In re Canal Const. Co.*, 21 *Del. Ch.* 155, 182 *A.* 545; *Duffy. v. Loft, Inc.*, 17 *Del. Ch.* 140, 151 *A.* 223, *affirmed* 17 *Del. Ch.* 376, 152 *A.* 849.

Petitioners contend that "if inspectors at an adjourned meeting can file a certificate declaring a result different from that announced at the original meeting, which would bind those present at such meeting and who on the basis thereof, have failed to attend the adjourned meeting, it is quite apparent that such practice could easily be used as an instrument of fraud." But it has not been shown that any one absented himself from the adjourned session in reliance upon the announcement at the original session.

Petitioners contend that even though the inspectors'

report may properly be amended, nevertheless, the inspectors erred in including John K. Colgate as present at the May 7 meeting, for reason that he was not there. However, the evidence in this connection confirms rather than overcomes the presumptive correctness of the inspectors' report.

As part of their case, respondents maintain that the inspectors failed to count certain shareholders who did attend the meeting. Neil P. Cullom was present for short periods at the original session as well as the later session. He testified in substance that his purpose was not to attend as a shareholder but solely in the capacity of attorney for the petitioners herein. In the case of *Duffy v. Loft, Inc.*, 17 *Del. Ch.* 140, 151 *A.* 223, 227, *affirmed* 17 *Del. Ch.* 376, 152 *A.* 849, it was held that where persons were authorized to appear as shareholders and also as a proxy committee for other shareholders, they must be regarded as present in both capacities. For analogous reasons, it follows that Cullom's shares should be counted.

Two of the three partners of Carret, Gammons & Co. and both partners of Bradley & Co. were present from time to time at the original and later sessions of the meeting. Respondents urge that shares registered in the names of the partnerships should be counted, although not included in the inspectors' report. Petitioners object on the grounds that many of the shares were held by the partnerships as nominees, that the real owners had never given the nominees authority to vote, and that the partners owned other shares individually, and were present in their capacity as individual shareholders. It is also contended that some of the beneficial owners had specifically instructed Carret, Gammons & Co. not to vote shares held for them. But it does not appear who such beneficial owners were, nor how many shares were concerned, nor even definitely how many of the total number of shares registered in the partnership name were held in a nominee capacity. Nor does it appear that any of the beneficial owners demanded a proxy, or attended the meeting,

or notified the corporation or the meeting, of their interest in the shares, or of their desire that the nominees should not vote.

Under *Section* 29 of the *Delaware Corporation Law* (*Revised Code of Delaware*, 1935, § 2061) as well as under the by-laws of the corporation, a record owner has the power to represent stock at a meeting. The statute provides in part:

> "The original or duplicate stock ledger shall be the only evidence as to whom are the stockholders entitled * * * to vote in person or by proxy at such election [of directors]."

The by-laws provide in part:

> "Each stockholder shall have one vote, for each share of stock having voting power, registered in his name on the books of the Corporation * * *."

Hence, the real owners must be taken to know that one of the consequences of permitting their stock to be held in the name of a nominee is that the latter will normally have the power to vote the shares without obtaining the consent of the owners, and that the corporation will recognize the registered owner as the true owner, at least under circumstances such as here. Although the partners did not attempt to vote the shares, they were present and in a position to demand that their right to do so be recognized. It follows that the shares registered in the names of the partnerships should be counted. As to the fact that the partners owned shares individually, they must be taken to be present in their partnership capacity as well, under the rule of *Duffy v. Loft, Inc., supra,* previously discussed.

Waldo H. Logan arrived at the meeting on May 8 after the inspectors had reported that no quorum was present, and after the motion for adjournment, but before the meeting had actually adjourned to that afternoon. Petitioners object that Logan's shares should not be counted because certain other shareholders had left the meeting before Logan

arrived. The effect of the withdrawal of shareholders will be considered in connection with questions concerning the adjourned session. In any event, a quorum was present at the first session without counting Logan's stock.

### 5. The adjourned session of May 8.

Petitioners consider erroneous the final certificate of the inspectors that a quorum was present at the adjourned session. The presence of a quorum at the original session removes any force from this contention, for all sessions were but a part of the same meeting, 5 *Fletcher on Corporations*, p. 77; and there is no requirement in the corporate by-laws, or otherwise, that a quorum remain continuously throughout a meeting. This the petitioners would concede, if a quorum had been ascertained and announced at the original session. Now, in the *Duffy* case, there was neither an ascertainment nor an announcement of a quorum, nor was any business transacted other than the appointment of a chairman, prior to the attempted withdrawal of the proxies upon which a quorum depended. The withdrawn proxies were never even presented to the meeting, but were produced only on court order at the time of the review of the meeting. Nevertheless, Chancellor Wolcott held that the existence of the proxies was "* * * a fact and failure to show the written evidence of it at the meeting cannot destroy it as a fact," and the shares were counted. Hence, the failure to ascertain and announce a quorum in the instant case did not defeat the meeting.

Aside from this, petitioners' other objections to the final report are likewise unavailing. They object that the inspectors accepted unsworn statements of third persons concerning the presence of shareholders. In the case of most corporations having numerous shareholders, it is unlikely that inspectors could be found who would be able to recognize at sight all, or even a large part, of the shareholders. Practical necessity requires that inspectors be authorized to

employ reasonable means to ascertain the identity and number of stockholders present. The obtaining of such information in writing from persons known to the inspectors and believed by them to be worthy of credence is manifestly a reasonable means for this purpose and is not cause to disregard the presumptive correctness of their finding.

Petitioners further challenge the final report on the grounds that the inspectors included as present at the later session persons who attended the first session, without a recount to ascertain whether they were in fact present; and that the inspectors refused to recognize revocations received after the opening of the meeting. No reason for withdrawal or revocation of proxies appears except, as to the latter, the desire to prevent a quorum. None of the revocations under discussion was received by the corporation or by any of the proxy committee before the meeting assembled.

The rule enunciated in the *Duffy* case is that a quorum once present cannot be destroyed by subsequent withdrawals or revocations of proxies. This is founded upon the policy that reasonable rules should prevail in aid of the accomplishment of the statutory purpose that meetings be held for the election of directors at the time fixed by the by-laws. It seems to me that even assuming that no quorum was present at the original session, the reasoning which supports the conclusion in the *Duffy* case is equally applicable here and requires a decision adverse to petitioners: that a shareholder or proxy holder, once having attended a meeting, should be deemed present for quorum purposes in the absence of some unusual circumstances, as in the case of *Leamy v. Sinaloa Exp. & Dev. Co., et al.*, 15 *Del. Ch.* 28, 130 *A.* 282.

The number of shares necessary for a quorum was 794,-070. If all other contentions were conceded in petitioners' favor, it would nevertheless result that there were represented at the original session, 800,870 shares, and at the later session, 812,376 shares. Since the ultimate outcome would

remain the same, the other questions need not be determined. The election was valid and the prayers predicated upon its invalidity should be denied.

A decree accordingly will be advised.