STANDARD POWER AND LIGHT CORPORATION, a corporation of the State of Delaware, CHAPMAN REID and LOUIS H. SEAGRAVE,

> Respondents Below, Appellants,

*vs.*

INVESTMENT ASSOCIATES, INC., a corporation of the State of Delaware, JACOB K. NEWMAN, JR., ROBERT J. LEVY and SERGEI S. ZLINKOFF,

> Petitioners Below, Appellees.

*Supreme Court, on Appeal, February 24, 1947.*

RICHARDS, C. J., and SPEAKMAN, TERRY, CAREY, and PEARSON, JJ., sitting.

*Howard Duane* and *Murray Taylor* and *H. Preston Coursen,* both of New York City, for appellants.

*John J. Morris, Jr.,* of Hering, Morris, James & Hitchens, and Benjamin Algase, Sergei S. Zlinkoff, and Herbert L. Barnet (of Hays, Podell & Shulman), of New York City, for appellees.

TERRY, *J.,* delivering the opinion of the court:

This is an appeal from a decree of the Court of Chancery involving *Section* 31 of the *General Corporation Law, Rev. Code* 1935, § 2063, relating to the review of corporate elections.

On May 7, 1946, a stockholders' meeting was held for the purpose of electing directors for the ensuing year for Standard Power and Light Corporation. Under the charter provisions 200,000 shares of preferred stock, 1,500,000 shares of common stock of the par value of $1.00, and 500,-000 shares of common stock Series B, no par value, are authorized. As of May 7th, 34,054 shares of the preferred stock, 1,320,000 shares of the common stock, and 110,000 shares of the common stock Series B had been issued and were outstanding.

It is conceded as of the May 7th meeting that five directors were to be elected; three by the holders of the shares of the common stock of the par value of $1.00, and two by the holders of the shares of the common stock Series B. We are not concerned with the election insofar as it relates to the Class A directors, except to say that each Class A director elected received a vote representing 807,438 shares out of a possible 1,320,000 shares.

The query presented relates to the election of two directors representing the holders of the common stock Series B. It is apparent that a proxy fight preceded the May 7th election. Chapman Reid and Louis H. Seagrave were nominated and supported by the management group. Jacob K.

Newman and Robert J. Levy were nominated and supported by others in opposition thereto. Subsequent to the taking of the vote the inspectors of election declared that Newman and Levy received a majority of the votes cast by the Series B stockholders, in that they received 42,519 votes as against 40,828 votes cast in favor of Reid and Seagrave. The chairman of the meeting ruled that a majority in number of the shares of the common stock Series B issued and outstanding had not been voted in favor of any nominee, and, therefore, Newman and Levy had not been elected directors to succeed Reid and Seagrave, who were elected at the stockholders meeting in 1944 and held over during 1945.

A solution to the questions suggested may be found, first, in determining the meaning to be given the language employed under Article Fourth of the certificate; second, a determination as to whether or not certain shares of the common stock Series B should have been voted at said election.

"Article Fourth: The holders of the Common stock shall have the right by the vote of a majority in number of shares of the Common stock issued and outstanding to elect a majority in number of the full Board of Directors of the corporation, such majority to consist of the smallest number of directors sufficient to constitute a majority in number of such full Board of Directors, and the directors so elected shall be known as Class A directors.

"The holders of the Common Stock Series B shall have the right by the vote of a majority in number of shares of the Common Stock Series B issued and outstanding to elect a minority in number of the full Board of Directors of the corporation, such minority to consist of the largest number of Directors which will constitute a minority in number of such full Board of Directors, and the directors so elected shall be known as Class B directors."

The issue framed under the first question is narrow. Does Article Fourth of the certificate require nominees for Class B directors to obtain the votes of a majority in number of the Series B shares issued and outstanding before they are elected, or is it necessary only that a majority in number

of the shares of the Series B stock issued and outstanding be voted at the election?

It will be noted that 83,347 shares out of a possible 110,000 shares of Series B stock were voted, thereby constituting a quorum under Article Eighth, Sec. 11, of the certificate.

The force of the respective arguments is based upon positive assertions that the language under Article Fourth is clear and unequivocal. The learned Vice-Chancellor held that the language used under said Article was not ambiguous; in fact, he said it was clear and readily understandable, in that said Article requires a majority in number of the issued and outstanding shares to be voted before Class B directors can be elected; but he further said that a successful nominee need receive only a majority in number of the shares actually voted.

The appellants assert that the Vice-Chancellor's interpretation tortures the language of the Article. In reality, they say such a reading necessitates striking from the charter provisions the words "by the vote of" and causes to be inserted in lieu thereof the word "provided", and, further, that the words "are voted" are inserted after the word "outstanding", thus causing the Article to read:

"The holders of the common stock Series B shall have the right (provided) a majority in number of shares of the common stock Series B issued and outstanding (are voted) to elect a minority of the Board of Directors."

The appellants assert that the Article provides definitely that "the holders of the common stock Series B shall have the right by the vote of a majority in number of shares of the common stock Series B issued and outstanding to elect a minority in number of the full Board of Directors." This quoted portion, they say, is couched in clear and emphatic language, necessitating, before any nominee can be elected, that a majority in number of the shares issued and outstanding, or at least the affirmative vote of 55,001 shares,

be cast in his favor. They urge, however, that if the quoted language be found to be ambiguous, a proper construction of the same, at least from the viewpoint of fairness and reasonableness, would be to conclude as contended for by them; for they say, that if the interpretation and construction placed upon the language by the Vice-Chancellor is affirmed, the directors would be elected not only by the votes cast in their favor but also by votes cast for other nominees as well, which is inherently self-contradictory. In the absence of express language to the contrary, they admit arguendo the substance of the general rule with respect to corporate elections, which is that a majority of the votes cast, provided a quorum is present, is sufficient to elect. However, they argue, "the right by the vote of a majority in number of shares issued and outstanding" (Article Fourth) clearly expresses a well-conceived plan, which abrogates rather than incorporates the rule. They contend that although a requirement of a majority of all the stock is exceptional as far as the election of directors is concerned, yet it is not unique. Citing *In re Argus Printing Co.,* 1 *N.D.* 434, 48 *N.W.* 347, 348, 12 *L.R.A.* 781, 26 *Am. St. Rep.* 639; *Vol. 5 Fletcher's Cyc. Corp. (Perm. Ed.) Sec.* 2020. Further, the concept as evidenced by the language used is not contrary to the provisions of the *General Corporation Law* of this State. Finally, the appellants maintain that their theory of construction is evidenced by a reading of other Articles of the charter, together with certain by-laws, wherein the controverted language appearing in Article Fourth is found; for instance, Article Eighth, Sections 11 and 12:

"Article Eighth. Sec. 11: For the business of electing directors and for the business of removing directors of any class, the holders of a majority in number of the class or series of stock entitled to elect the directors of that class shall constitute a quorum, without the necessity of there being present or represented or notified the holders of stock of any other class or series.

"Sec. 12: Except as hereinabove specifically provided, all action which may be taken by the stockholders of this corporation shall be

taken by the vote of a majority in number of all shares of each class and/or series of stock having voting power in respect of such action, and no action of the corporation, the validity of which is dependent upon such action by the stockholders, shall be valid or have any effect whatsoever unless authorized, ratified, approved or confirmed by the vote of a majority in number of all shares of each class and/or series of stock having voting power in respect of such action."

The appellees maintain that Article Fourth places no restriction whatsoever on the manner in which any group has the power to act; namely, through the votes of a majority of that group. They assert that no language appears in Article Fourth which would afford any basis for nullifying the action of the Series B stockholders in exercising their power to elect directors through a majority of their number voting for the election of such directors simply because the majority votes representing a majority in number of the issued and outstanding shares are divided between two nominees. They urge that a reading of the language of Article Fourth will show a complete absence of any words indicating, as appellants contend, that a successful nominee or candidate must receive the affirmative vote of a majority in number of all the issued and outstanding Series B stock. Citing *Virginian Railway Co. v. System Federation,* (4 *Cir.*) 84 *F. 2d* 641, *affirmed* 300 *U.S.* 515, 57 *S. Ct.* 592, 81 *L. Ed.* 789. Finally, the appellees contend that if the language employed be found to be ambiguous, the application of certain well defined rules of construction will resolve the ambiguity in their favor. First, they say there can be found no language under Article Fourth which indicates that the general rule pertaining to corporate elections was intended to be abrogated; second, that rules relating to well established democratic processes should be followed, and, third, that a construction should be had in the light of fairness and reasonableness, as the same applies to corporate enterprise.

Merely because the thoughts of party litigants may differ relating to the meaning of stated language does not in itself establish in a legal sense that the language is am-

biguous. Words and phrases employed by incorporators in drafting a certificate should be given their common accepted meaning, unless the context clearly requires otherwise or unless legal phrases having a special meaning are used. But where the language is not expressed with that clarity of expression which permits of but one reasonable interpretation, the language must be said to be ambiguous, and resort must be had for assistance through certain well-established legal rules of construction.

Neither of the respective interpretations is without merit. Indeed we appreciate the force of each. Necessity, therefore, dictates the application of judicial construction, in order to determine the meaning to be ascribed to the language used.

We commence with the thought that corporate enterprise should adhere to well-established democratic theories, which embody principles of fairness and reasonableness as opposed to principles which are unfair and unreasonable. Shareholders, constituting the backbone of corporate enterprise, must be assured in this respect.

Outstanding among the democratic processes concerning corporate elections is the general rule that a majority of the votes cast at a stockholders' meeting, provided a quorum is present, is sufficient to elect directors. *Hexter v. Columbia Baking Co.*, 16 *Del. Ch.* 263, 145 *A.* 115; 5 *Fletcher's Cyc. Corp.*, (*Perm. Ed.*) *Sec.* 2020. If this rule is not to be observed, then the charter provision must not be couched in ambiguous language, rather the language employed must be positive, explicit, clear and readily understandable and susceptible to but one reasonable interpretation, which would indicate beyond doubt that the rule was intended to be abrogated. *Goldman v. Postal Telegraph, Inc.*, (*D.C.*) 52 *F. Supp.* 763. The strength of the appellants' position in this respect springs from an able argument rather than the presence of clear and unequivocal language. We are unable to find the use of any words under Article Fourth

which would militate against the application of the general rule.

The present incumbent Class B directors were originally elected without opposition in 1944 at the annual stockholders' meeting. In 1945 the management was unable to secure the presence of a majority of the issued and outstanding Series B stock so as to constitute a quorum of that class for the purpose of electing Class B directors. The annual meeting was adjourned from time to time, and finally adjourned *sine die*. Thus, the Class B directors elected in 1944 continued to hold office up to the annual stockholders' meeting of Standard in 1946. By virtue of the proxy contest between management and those in opposition thereto there was represented at the 1946 meeting a duly constituted quorum of the Series B stock, and all of the shareholders present participated in the voting for Class B directors.

It is evident, we think, that an acceptance of the appellants' construction would have the effect, as a practical matter of saying, whenever a contest for the election of directors occurred, that the incumbents then in office would continue to hold office. In fact, 99% of all the issued and outstanding Series B shares might be voted, and, yet, no Class B directors elected. Such a conclusion does not bespeak fairness and reasonableness, insofar as corporate enterprise is concerned. Such a result would be inequitable, unusual and such as reasonable men would not likely intend.

The construction approved in the Vice-Chancellor's opinion is consistent with the policy as to corporate elections indicated in the following language of Chancellor Wolcott in the case of *Duffy v. Loft, Inc.*, 17 *Del. Ch.* 140, 151 *A.* 223, 227, *affirmed* 17 *Del. Ch.* 376, 152 *A.* 849:

"The statute of this state under which the corporation was created provides that directors shall be elected at an annual meeting of stockholders. The duty to hold such a meeting and to elect directors thereat is one that is laid by the statute. So important is the direction that this duty be performed that in some instances courts have brushed

aside all strictness and technicality of view in the interest either of securing a statutorily commanded election or, if one has been sought to be held, of sustaining its results. * * *

"Reasonable rules ought to prevail in aid of the accomplishment of the statute's purposes, and a certain degree of liberality in favor of a meeting ought to prevail. To take any other view would be to encourage the prolongation of internal strife between rival factions and keep the corporation's affairs in such a state of confusion and turmoil that the business which it was organized to conduct will inevitably suffer to the damage of its stockholders. Where an extensive campaign has been carried on by rival groups for the votes of stockholders and the arguments pro and con have been made, the parties interested should submit to a count and let the majority prevail. If such a course is not pursued, if after the contest has been waged one side defeats a decision by mere tactical maneuvers, the whole business must be gone through with again with its consequences of expense and disturbance. And in many instances the situation will simply be one where the side that appears to have lost will resort to schemes in order to create an opportunity for a second try in the hope that perhaps better success will be had the next time. Thus the corporation's affairs, their peaceful and undisturbed administration will be subordinated to the factional interests of rival contenders."

We have examined the language of other articles of the charter, together with the by-laws, as suggested by the appellants, with the thought that assistance might be had in construing Article Fourth. However, the articles and by-laws referred to have not been found to be helpful. At most, the language used, while identical, offers the same problem. It should be said, however, that the language found under Article Eighth, Sec. 11, requiring the presence for quorum purposes of a majority in number of the shares of the Series B stock before the stockholders are entitled to vote for the election of Class B directors, must be distinguished from similar language found under other Articles, including Article Fourth. This is so for the reason that the provisions serve independent purposes.

To elect a Class B director we are of the opinion that Article Fourth should be construed to mean that a majority in number of the issued and outstanding Series B shares

must be voted, and that this is the full extent of the charter requirement in this regard. Which of two candidates for one directorate is elected by such vote depends upon which candidate received the greater number of votes, in accordance with the usual rule.

Now the appellants contend that, notwithstanding our construction of Article Fourth, Newman and Levy were not elected directors for they failed to receive, in accordance with the usual rule, the required number of the votes cast.

The Vice-Chancellor ascertained that 85,515 votes had been cast, and of those votes Newman and Levy each had received 42,807 and Reid and Seagrave each had received 42,708.

The appellants specifically challenge the counting of the following proxies in favor of Newman and Levy:

| | |
|---|---|
| Ladenburg, Thalmann & Co. | 9,847 Shares |
| Frank Piserchio | 100 Shares |
| David Howard & Mrs. Betty Howard | 1,200 Shares |
| Alex Heming & Mrs. Hannah Heming | 11 Shares |
| George R. Young & Mrs. Gertrude Young | 11 Shares |

We shall consider the proxies in the above order.

*Ladenburg Thalmann & Co., 9,847 Shares:* The management group objected to the voting of this proxy at the May 7 stockholders' meeting. However, the first statement forming the basis of any objection to the voting of the proxy will be found in the proceedings before the Vice-Chancellor. The appellants contend that Newman unlawfully solicited the proxy on or about April 3rd or 4th, 1946, approximately nineteen days prior to the mailing of the proxy statement in conformity with the provisions of the *Securities Exchange Act of* 1934, 15 *U.S.C.A.* § 78a, *et seq.* The substance of the objection lies in the fact that since the Series B stock was traded in on the New York Curb Exchange, certain provisions of the *Securities Exchange Act,* relating to the solici-

tation of proxies, were violated, thus nullifying the validity of this proxy for voting purposes at the May 7th election.

*Subdivision (a) of Section 14 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78n(a),* provides:

"Sec. 14. (a) It shall·be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered· on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

*Rule X-14-A-1 of the rules under Section 14 of the above Act* provides:

"No solicitation subject to section ·14 (a) shall be made unless each person solicited is concurrently furnished or has previously been furnished with:

(a) A written proxy statment containing the information specified in schedule 14A * * *."

*Section 27 of the Federal Act, 15 U.S.C.A. § 78aa,* provides:

"The district courts of the United States, the district court of the United States for the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found òr is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. * * *"

The appellants contend that on or about the end of March, 1946, Newman cabled Benjamin Guinness, thinking he might have shares of the Series B stock, and requested that a proxy be executed in his favor. They contend, as a result of the cablegram, that Ladenburg, Thalmann & Co. received instructions by cable dated April 3rd or 4th instructing them to execute proxies for an aggregate number of 9,847 shares in favor of Newman; that Newman on or about the 3rd or 4th of April received a proxy representing 9,847 shares in his favor, the proxy having been executed by Ladenburg, Thalmann & Co.; that this proxy was solicited and received long prior to the mailing of the proxy statement, which the appellants assert was not mailed until April 22, 1946. They admit the execution of a second proxy for the same number of shares by Ladenburg, Thalmann & Co., which said proxy was executed subsequent to the mailing of the proxy statement on April 22nd. However, they contend, since the original solicitation was not accompanied by a proxy statement, that *Rule X-14-A-1* of the *Securities Exchange Act* was violated. The argument advanced, however, is not predicated upon an alleged duty of the Vice-Chancellor or this court to enforce the federal statute; rather, they say that the Vice-Chancellor should have resolved the issue of fact and should have determined whether or not there had been an unlawful solicitation in violation of *Rule* X-14-*A*-1; and that if it was found as a fact that the *Rule* had been violated, then, the Vice-Chancellor should have invoked the equitable doctrine of unclean hands; otherwise, the court would condone, if not in fact become a party to, the unlawful solicitation.

In support of the validity of this proxy the appellees maintain, among other things, that the proxy was not obtained in violation of *Rule X-14-A-1* of the *Securities Exchange Act*. Admitting arguendo that a proxy was executed to Newman for the shares as of April 3rd or 4th, the appellees say, nevertheless, that such evidentiary fact, even though established, is of no import, for the reason that the

proxy voted at the May 7th meeting was executed April 24th, two days subsequent to the mailing of the proxy statement, which they contend was mailed on April 22—the statement having been previously cleared through the Securities Exchange Commission and mailed to all the registered holders of the Series B shares.

They further contend, irrespective of the question as to the manner in which the proxy as voted was solicited, that the Court of Chancery under *Section* 31 should not conclude either the proxy or the vote thereon to be invalid. Two reasons are advanced: (1) The proxy and proceeding thereunder meets the requirements of the *General Corporation Law*. (2) Exclusive jurisdiction relating to violations of the *Securities Exchange Act* and any rule pertaining thereto is vested in the federal courts.

We will not attempt to resolve the question of fact relating to the solicitation of the proxy, insofar as it relates to compliance or noncompliance with *Section* 14 (*a*) of the *Securities Exchange Act of* 1934 or *Rule X-14-A-1* under it. This issue lies solely within the exclusive jurisdiction of other tribunals under *Section* 27 of the Act, and this court will not usurp that jurisdiction or any portion thereof. It is understandable why the legislative intent as to jurisdiction was so clearly expressed under *Section* 27, for, if uniformity of enforcement in the true sense is the object of the purpose to be attained, centralization of judicial decision and discretion should be as designated. Likewise, the doctrine of unclean hands as advanced is not properly before us by reason of our refusal to consider the validity of the solicitation. The solicitation, the proxy, and the voting of the same have not been challenged under the provisions of the *General Corporation Law* of this State. The objection raised by the appellants cannot be sustained. We find no error in voting these shares for the opposition candidates.

Inspectors of election are ministerial rather than judicial officers. *Gow v. Consolidated Copper Mines,* 19 *Del. Ch.*

172, 165 *A*. 136. Even when considered in a plenary judicial proceeding, whatever reasonably purports to be a proxy of a shareholder entitled to vote at an election is entitled to a *prima facie* presumption of validity. *Atterbury v. Consolidated Copper Mines Corp., 26 Del. Ch.* 1, 20 *A.* 2d 743. This general rule is pertinent in the consideration of each of the following questions relating to the voting of proxies.

*Frank Piserchio, 100 Shares.* In this case two proxies were presented—one a management proxy for 100 shares, the other an opposition proxy for 100 shares—each proxy signed "Frank Piserchio". Only one hundred shares were registered in this name. The opposition proxy bears an execution date and a postmark date, both of which are subsequent to the execution and postmark dates on the management proxy. The inspectors of election, because of what they believed to be a variance in the signatures, refused to count either proxy. Both parties concede that the two proxies were not signed by the same person.

The appellants contend that the opposition proxy obviously is a forgery. They base their contention upon the testimony of an expert who testified that in his opinion the same person who signed the name of Thomas Piserchio to two other proxies signed the name of Frank Piserchio to the opposition proxy. No additional proof was presented before the Vice-Chancellor. Frank Piserchio did not appear in person.

The Vice-Chancellor determined that the proxy in favor of the opposition candidates should be counted. Two questions are presented: (1) Is the charge of forgery sustained by the evidence before the court? (2) If not, then which of these two proxies should be counted?

Whenever a charge of forgery is asserted pertaining to the validity of a proxy the court should exercise due care, demanding of the accuser strict proof in support of his challenge. The shareholder whose signature was allegedly

forged should preferably be produced, and in any event the proof should be convincing to warrant a holding that there was a forgery. Corporate elections often produce heated arguments resulting in bitter accusations, and the court must safeguard the shareholder in this respect; otherwise, he might be disenfranchised without cause. The proof at hand falls short of establishing a forgery.

We know of no statute or rule of law that militates against a shareholder's authorizing a third party to sign his (shareholder's) name to a proxy. The mere fact that the signature on a proxy is not in the handwriting of the shareholder does not invalidate the proxy. *Stephens Fuel Co. v. Bay Parkway Nat. Bank,* (2 Cir.) 109 *F.* 2d 186. Consequently, when two proxies are offered bearing the same name, then the proxy that appears from the evidence to have been last executed will be accepted and counted under the theory that the latter—that is, more recent— proxy constitutes a revocation of the former. Here the subsequent execution date and postmark date are sufficient evidence to warrant a finding that the opposition proxy was given subsequent to the management proxy. Thus, the Vice-Chancellor properly ruled that the Frank Piserchio proxy for 100 shares should be voted for the opposition.

*David Howard and Mrs. Betty Howard, 1200 Shares.* The appellant contends that the Howards are husband and wife; that 1200 shares of the Series B stock are registered in their names under the style of David Howard and Mrs. Betty Howard; that David Howard signed both his name and his wife's name to the proxy for 1200 shares in favor of the opposition; that the proxy being only in the handwriting of David Howard is not *prima facie* valid, because it is not signed by the other tenant by the entirety; that although David Howard saw fit to add the words "and Mrs. Betty Howard" to his signature in executing the proxy, this fact does not show that the granting of the authority to vote the stock was exercised "jointly but not otherwise"

by both the tenants by the entirety. Accordingly, they say, as the proxy itself reveals, that it was executed by one tenant by the entirety and not by both of them, the proxy is invalid. Citing *In re Giant Portland Cement Co.*, 26 *Del. Ch.* 32, 21 *A. 2d* 697.

One of the contentions advanced by the appellees is that the proxy was *prima facie* valid, and that one attacking the proxy bearing the names of both tenants must assume the burden of demonstrating to the court either that the person signing the proxy (assuming one person signed both names) was not authorized to sign for the other, or that such signature was not adopted by the other person. *Atterbury v. Consolidated Copper Mines*, 26 *Del. Ch.*, 1, 20 *A. 2d* 743; 5 *Fletcher's Cyc. Corp. (Perm. Ed.) Sec.* 2038; 18 *C.J.S., Corporations*, § 548, *p.* 1247.

The *Giant Portland Cement* case relied upon by the appellants is not in point. In that case, although the stock was held by the entirety, the husband's name alone appeared on the proxy. Here the names of both appear. Admitting arguendo that David Howard signed both names to the proxy, it would still be *prima facie* valid until the appellants establish to the court's satisfaction that David Howard was not authorized to sign for his wife, or that her name appearing on the proxy was not adopted by her. Such proof has not been advanced. The proxy was properly counted for the opposition.

*Alex Heming and Mrs. Hannah Heming, 11 Shares.*

*George R. Young and Mrs. Gertrude Young, 11 Shares.*

The Heming and Young proxies were voted at the May 7th meeting for the opposition candidates. The appellants' objection to the voting of these proxies is the same as advanced with respect to the David Howard and Mrs. Betty Howard proxy. According to the reasons set forth in our consideration of the Howard proxy, we conclude that the

Heming and Young proxies were properly voted for the opposition candidates.

We deem it unnecessary to consider objections raised by the appellees to the voting and counting of other proxies in favor of the management candidates.

The decree of the Court of Chancery should be affirmed.