## No. 17,231.

BURLESON *v.* HAYUTIN ET AL.
(273 P. [2d] 124)

Decided July 26, 1954. Rehearing denied August 16, 1954.

Mr. John T. Dugan, Mr. Samuel J. Eaton, for plaintiff in error.

Mr. Irving J. Hayutin, Mr. Arthur B. Hayutin, for defendants in error.

*En Banc.*

Mr. Justice Holland delivered the opinion of the Court.

The writ of error issued in this case presents a review of an order of the trial court denying a petition for the appointment of a receiver, such review being allowable under Rule 111 R.C.P., Colo. Burleson, plaintiff in error, and Vaughn, his brother-in-law, were copartners and the owners of the Curve Tavern located in Adams county prior to March 1, 1951. Irving J. Hayutin and Arthur B. Hayutin, both of whom are defendants in error, were attorneys for Burleson and Vaughn during the period of their operation of the business and prior thereto. The relationship thus existing was highly fiduciary and of a delicate, exacting, and confidential character, requiring a high degree of fidelity and good faith, and involving personal trust and confidence not to be betrayed by the attorneys, as undoubtedly seems to appear in this case. Vaughn sold his interest in the copartnership to the Hayutins; a Colorado corporation was formed on April 2, 1951; the assets of the partnership were transferred to the corporation; one-half of the capital stock was issued to Burleson; and the other one-half issued to the individual defendants, four of whom are Hayutins, and one, Matthew L. Raia. The fee owner of the property on which the business was operated, as lessor, agreed that the lease given to the partnership could be transferred

to the corporation upon certain conditions, and particularly, that the stock of the new corporation would be placed in escrow and not disposed of except as provided in the lease; defendant Irving J. Hayutin was named as escrow holder, and he received the stock as such. At the first meeting of the corporation Burleson was elected directed and was appointed president of the company, actively managed the business, and received $250.00 per month as salary therefor until March 15, 1952. On that date, in a meeting of the board of directors, Burleson was informed that his position as president and his salary were terminated and Raia would be the new president. At a later meeting, on April 10, this action of the board of directors was affirmed and Burleson was notified in writing that he was not in any way to interfere with the business nor any of its employees; that if he persisted in exercising any degree of control in the business, he would be asked to leave. The board of directors had authorized payments to the new president, Raia, of a salary of $150.00 per month as president, $250.00 per month as bartender, and 15% of the quarterly net proceeds of the business. The board also authorized the payment to Arthur B. Hayutin of $150.00 per month as vice-president, 15% of the quarterly proceeds of the business, and a salary of $125.00 per month to be paid to Irving J. Hayutin as secretary-treasurer, plus 10% of the quarterly proceeds of the business.

It is said by counsel in the briefs that Burleson was discharged for cause, although the record does not disclose the cause for which he was discharged, but does show that on August 31, 1951, at the request of Irving J. Hayutin, Burleson gave Hayutin his proxy authorizing him to appear at any meeting of the stockholders of the corporation and vote his stock. As stated in this proxy, it was to be in full force and effect so long as the two Hayutins owned any stock in the corporation. It further is shown that the giving of this proxy was the only condition upon which Burleson would be rehired by the

corporation as a bartender, and, of course, Burleson's 50% of the stock of the corporation was voted by Hayutin at the meeting whereat the salaries and bonuses herein referred to were put into effect. Counsel for defendants Hayutin state in their brief "that the proxy was given to enable Hayutin to further his own interest rather than to register the will of Burleson, the principal, is obvious and was clearly 'a power coupled with an interest' not revocable at the will of the donor." It freely is admitted by defendants that the business prospered; however, Burleson had not, up to the time of the hearing in this case, received a penny therefrom in the way of salary or dividends while owning one-half of the corporation. On January 2, 1953, apparently the day before the annual meeting of the stockholders of Curve Tavern, Inc., Burleson gave his proxy to his attorney, John T. Dugan, to appear for him and vote his stock at the corporation meeting. Dugan appeared at the meeting, objected to the election of officers, and insisted that he be allowed to vote Burleson's stock under the proxy, but this right was denied by Hayutin, who claimed that he had Burleson's irrevocable proxy, and he exercised his voting privilege thereunder at the meeting.

On June 2, 1952, Burleson filed his complaint in the district court for an accounting, for dissolution of the corporation, and for receivership and damages; alleging that during the time of the formation of the corporation the Hayutins were attorneys for Burleson and maintained confidential relation with him; that he has been illegally deprived of his interest in and to the said business; that the Hayutins have converted his business to their own use and benefit; that Burleson had been deprived of any voice in the control or management of the corporate affairs; requested that a receiver be appointed; that an accounting be had of the affairs of the corporation; that the corporation be dissolved; and that he have judgment against defendants for whatever might be found to be due. On June 20, 1952, a hearing on the

petition for the appointment of a receiver was had; the court found that 50% of the stock of the corporation was held by Burleson and the other 50% by defendants; that after about a year following the incorporation of the company, disagreement arose between Burleson and the defendants and that they could not agree on the management of the company; that although defendants had only 50% of the stock, they constituted a majority of the board of directors and had full control of the management of the corporation. It further found that the evidence did not disclose any mismanagement of the company; and that although plaintiff in the complaint alleged payments by defendants to themselves of exorbitant salaries, the evidence did not support these allegations. We do not understand this particular finding of the trial court, in view of the fact that the record of the corporation shows the plan of management and the resolution adopted by the owners of only 50% of the corporate stock, and Burleson receiving nothing and having no voice therein. The court made a rather lengthy and somewhat inconsistent finding, and by holding that no emergency existed, denied the petition for the appointment of a receiver and ordered defendants to answer the complaint within twenty days.

Following the January 1953 annual meeting of the stockholders to which we have hereinabove referred, Burleson was granted leave to file, and did file, an amended complaint and the petition for the appointment of a receiver. He alleged in the amended complaint that all action taken at said stockholders' meeting was void and of no effect whatever; that therefore there was no lawful board of directors or other governing body of the corporation; that the officers that were purporting to be in charge of the affairs of the company were not lawfully elected or appointed; that the assets of the corporation are in danger of being lost and destroyed; and that for the protection of the rights and interest of Burleson, a receiver should be appointed. It was disclosed without

dispute at the hearing on this petition that there was such dissension between the stockholders that it was impossible for the deadlock of the stockholders to be broken, or for a board of directors to be legally elected. In denying the petition for the appointment of the receiver, the trial court made the following statements:

"The Court: Counsel has asked the question what relief he had. I have listened to this case, and I have heard no additional evidence beyond what has been presented to me in the prior application for a receivership, to wit, that the Hayutins are still running the tavern and Mr. Burleson is not. There is no additional evidence that there has been any mismanagement or anything else.

"You ask what his relief is, and I have stated on a stipulation I obtained from the parties previously, particularly the defendants, they have virtually consented to a dissolution of the corporation, but they want to do it as a going concern. I have told both parties, and I reiterate it, that this tavern is for sale and that Mr. Burleson's relief is to get someone who is a partner with him and can get along with him to buy out the Hayutins. They stated a price. That price was the same as the best offer that anybody would give, they would sell it for what anybody else would buy it for. In other words, they will take 50 per cent of what this man offered after adjustments. If he wants to buy it he has first chance. I have stated that, and they have stated they would sell. That was stated two months ago.

"I said to go out and get a backer. I said to Mr. Dugan perhaps it would be easier to find somebody to buy 50 per cent, to come in with nine or ten thousand, than to get somebody with $22,000. Nobody has come forward to back Mr. Burleson in the matter * * *."

Burleson contends that his giving of the second proxy on January 2, 1953 to his attorney, John T. Dugan, effectively revoked the proxy given to defendant Irving J. Hayutin, despite the fact that it was stated in the proxy that it was to continue so long as defendants Hay-

utin remained stockholders in the corporation. This second or later proxy was regularly presented at the meeting of the stockholders, but it was not allowed to be used, and the election of officers and other business of the corporation was conducted by use of the original proxy. This second proxy undoubtedly revoked the first proxy and the failure to recognize this revocation and give force and effect to the second proxy invalidated the entire corporate transactions of the meeting where it was presented. As hereinbefore shown from the statement of defendants in their brief, the original proxy given to Irving J. Hayutin was not coupled with an interest in the stock of the corporation as such. The only interest was that of its effect in furthering the interest of the Hayutins and therefore the general rule that a proxy given by a stockholder to vote his corporate stock at a meeting of the stockholders is revocable by him although the proxy by its terms seems to be made irrevocable when such proxy is not coupled with an interest as herein indicated; otherwise, a so-called irrevocable proxy is contrary to public policy. We believe the rule is well stated in the 1953 Cum. Supp. to volume 13 American Jurisprudence, section 499, page 57, and is as follows: "Where a proxy remains revocable, it may be revoked by the simple act of the stockholders of record appearing at the meeting and voting or offering to vote the stock, or by giving a later proxy to another to vote the same stock."

According to this rule, to which we adhere, the only proxy that was effective for the exercise of the will of Burleson in the stockholders' meeting was the later proxy given to, and presented by, his attorney. This being the case, it follows that the election of directors purportedly chosen at the last meeting of the stockholders was illegal and that the acts of that board are without effect as to the interest of Burleson.

It is abundantly clear from the record which was before the trial court that it was an equal division or dead-

lock of the stockholders and that the corporate affairs of the corporation were thus bogged down; however, it just as fully appeared that one-half of the stockholders, or the interest of the corporation was assuming full control and acted accordingly to their own use and benefit, all to the exclusion of Burleson; that ample arrangements were made to absorb much of the income of the corporation by salaries created and bonuses provided for, without any recognition of Burleson, by which he should share in the benefits of the profits due him as owner of one-half of the corporate stock of the corporation.

 While the trial court seemed to be too timid concerning the matter of the appointment of a receiver, with undue concern as to the effect thereof upon the credit of the corporation, it overlooked the fact that it had found the very conditions to exist that call for the appointment of a receiver to protect the assets of the corporation, and particularly the interests of Burleson. The trial court's proposal to find a buyer and form a partnership was an invitation to Burleson to deal at the Hayutins' bargain counter without full protection to which he was entitled, but denied under the illegal setup by which the corporation was being managed. The pages of reported cases and text writers are full of situations showing that: "The courts have been comparatively liberal in the appointment of a receiver of a corporation, even though it is a solvent and going concern, where there is such dissension among the stockholders, directors or officers that the corporation cannot successfully carry on its corporate functions, imminent danger of loss of assets is threatened, and no other remedy appears to be adequate." 43 A.L.R. 260. Where Burleson, owning one-half of the outstanding stock of the corporation, has been denied a voice in the management, or the affairs, of the corporation, it is no relief to him for the trial court to say that he should sell his stock and abide by the results. Without a direct accusation, the entire ramification of the manipulation of the affairs of this corporation, as

66

appears from the record in the case, is sufficiently colorful to direct suspicion upon the original attorneys for Burleson, in whom he had reposed confidence, in an attempt to take advantage of that confidence and strip him of his property and the rights incident thereto by the means here employed, which they now contend was, and is, legal in all of its aspects. Burleson is the victim of a wrong perpetrated upon him, and is then advised by the court that there is no remedy.

The trial court erred in denying the petition for the appointment of a receiver; therefore its judgment is reversed; the cause is remanded with directions to appoint a receiver; and then proceed toward an accounting of the affairs of the corporation during the period in which, through the operations of the holders of the other fifty per cent of the stock, Burleson found himself to be in the position of an outsider, through no fault of his own.