761 P.2d 438

**Clara PENA, Barbara Page and Polecarpio Anaya, Plaintiffs–Appellants, Cross–Appellees,**

v.

**WESTLAND DEVELOPMENT CO., INC., a New Mexico Corporation, et al., Defendants–Appellees, Cross–Appellants.**

**No. 9676.**

Court of Appeals of New Mexico.

June 7, 1988.

Certiorari Denied Aug. 4, 1988.

David C. Hughes, Hughes & Carver, P.C., Albuquerque, for plaintiffs-appellants, cross-appellees.

Ronald Segel, Sutin, Thayer & Browne, P.C., Albuquerque, for defendants-appellees, cross-appellants.

## OPINION

BIVINS, Judge.

Plaintiff Clara Pena filed suit against defendant Westland Development Co., Inc. (Westland) following a shareholder election selecting Westland's board of directors.

The trial court appointed a special master to tabulate the results and categorize challenges to a number of shareholder proxies. Following the special master proceedings, Barbara Page and Polecarpio Anaya were joined as plaintiffs on the trial court's own motion. After a nonjury trial, the trial court entered a judgment establishing the results of the election. Plaintiffs appeal from that judgment and Westland cross-appeals. Plaintiffs raise three claims of error and Westland four. We identity and discuss each issue after reciting the factual background. We affirm in part and reverse in part.

FACTS

Plaintiffs ran as a nonmanagement slate in the election that is the subject of this suit. The election was held on November 16, 1985, at a shareholders' meeting. Some shareholders cast ballots at the meeting, and others voted by proxy. The election was extremely close and both sides actively solicited votes. During the process of counting the ballots and proxies, disputes arose between the management faction and the nonmanagement faction. On December 4, 1985, Pena filed a complaint requesting a temporary restraining order to halt the counting of the votes, and the appointment of a special master to count the votes and deal with challenges to the ballots and proxies. The temporary restraining order was granted and a hearing held on December 5. Following the hearing, the trial court ordered the counting to continue, subject to certain conditions. More disputes arose and Pena asked for additional intervention by the trial court.

The trial court granted another temporary restraining order imposing additional conditions. Then, on January 3, 1986, the trial court appointed a special master to supervise the proceedings, tabulate the votes, and determine the existence of challenges to proxies or ballots. The special master held meetings on January 8, 13, 15, and 16. At these meetings, Pena and Westland raised a variety of challenges to the proxies. Neither side challenged any of the proxies on the basis that the signatures on the proxies were forgeries. By the end of the special master meetings, Pena and Westland had agreed that 966 nonmanagement proxies and 918 management proxies would not be challenged, and these proxies were segregated into a separate box.

On January 31, after the special master proceedings concluded, the trial court held a hearing to rule on the parties' objections to the various proxies. Following the January 31 hearing, the proxies and ballots were submitted to a private accounting firm to be counted. The parties were allowed to challenge the accounting firm's procedures and final tally.

Later in February, Westland asked the trial court to order Pena to pay the costs of the special master proceedings, including the accountant's fees. Westland maintained that since Pena had asked for the appointment of the special master, she should bear the cost. The trial court ordered Westland to pay the costs, but reserved ruling on who would ultimately be responsible for them.

In March, Westland moved to join Page and Anaya as plaintiffs. Westland wanted them to be available to help pay the costs if the trial court ordered Pena to pay them. The trial court denied the motion, but joined Page and Anaya as plaintiffs on its own motion, ruling that they would not be responsible for any costs incurred prior to the time of their joinder.

On April 29, Pena moved to allow a renewal of objections to proxies that had been uncontested. The basis of the motion was plaintiff's claim that since the conclusion of the special master proceedings, she had discovered that a number of the uncontested proxies contained forged signatures. The trial court denied Pena's motion, stating that there would be no reopening of the special master proceedings. Later, at trial, plaintiffs submitted offer-of-proof testimony that they had discovered the first forgery by accident, in early February; that they did not obtain copies of the proxies until early March, and only then were able to begin to investigate the signatures; and that they had uncovered enough forgeries to change the result of the election.

On May 15, Page and Anaya made their own motion to renew objections to the uncontested proxies on the same grounds as Pena's motion. This motion was also denied. The trial court ruled that Page's and Anaya's rights had been protected by Pena, and noted that Page had been present at many of the trial court proceedings and at the special master proceedings.

The trial was held on July 15, 1986. Most of the trial time was consumed with plaintiffs' offer of proof concerning the forged proxies. Plaintiffs presented witnesses who testified that the signatures on management ballots were not theirs. Plaintiffs also offered depositions of unavailable witnesses who said the same thing. Finally, plaintiffs offered Page's testimony regarding her lack of access to the proxies and the lack of knowledge that forgery might be a problem until after the special master proceedings ended.

The trial court entered judgment establishing the management slate as the winners of the election. The margin of victory between the management candidate with the least votes and the nonmanagement candidate with the most votes was less than 400 out of a total of almost 300,000 votes. A change of only 500 votes from management candidates to nonmanagement candidates would have elected two of the nonmanagement candidates. In addition to determining the results of the election, the trial court also held Westland responsible for the costs of the special master proceedings.

DISCUSSION

*Trial Court's Refusal to Allow Plaintiffs to Challenge Allegedly Forged Proxies*

Plaintiffs' initial contention is that they should have been allowed to challenge proxies that they had agreed, in the special master proceedings, not to challenge. They liken the situation to one in which a party enters into a stipulation that proves to be contrary to the facts, and argue that the trial court should have granted them relief from that stipulation. Page and Anaya argue, in addition, that they were not joined as parties until after the special master proceedings were concluded, and that they should not be bound by any stipulations entered into before they became parties. We need not address that issue because of our disposition of the first contention.

 It is true that a court may set aside a stipulation if a mistake of fact is clearly shown, the mistake is material to the case, and the mistake could not have been avoided through the exercise of due care. *See Ballard v. Miller,* 87 N.M. 86, 529 P.2d 752 (1974); *Marrujo v. Chavez,* 77 N.M. 595, 426 P.2d 199 (1967). The decision as to whether a stipulation should be set aside is within the discretion of the trial court. *Id.* Thus, under plaintiffs' argument, the trial court's refusal to set aside the stipulation and allow them to challenge the "uncontested" proxies is reviewable only for an abuse of discretion.

 While the argument regarding setting aside stipulations does seem to have some applicability to the situation at hand, we believe that a more apt analogy is a motion for a new trial based on newly-discovered evidence, or a Rule 60(B) motion (SCRA 1986, 1–060(B)) to set aside a judgment based on such evidence. A special master proceeding is a quasi-independent proceeding from the rest of the trial; for example, the trial court may only review the special master's findings of fact to determine whether they are supported by substantial evidence. *State ex rel. Reynolds v. Niccum,* 102 N.M. 330, 695 P.2d 480 (1985). The trial court may not set aside the special master's findings just to reweigh the evidence. *Lopez v. Singh,* 53 N.M. 245, 205 P.2d 492 (1949). This case involves evidence discovered after the conclusion of the proceeding, and plaintiffs are in effect asking to reopen that proceeding to change the result. The trial court acknowledged this when it denied their motion, by stating that it would not go back in and reopen the special master hearing. We will, therefore, apply the principles of review applicable to the denial of a motion for a new trial to the situation at hand. The result we reach would be the same regardless of which approach we utilize.

A motion for a new trial based on newly-discovered evidence is addressed to the trial court's discretion. *Hill v. Burnworth*, 85 N.M. 615, 514 P.2d 1312 (Ct.App. 1973). Therefore, our review is limited to determining whether the trial court abused its discretion in refusing to allow plaintiffs to raise the forgery issue with respect to the unchallenged proxies.

The prerequisites for granting a motion for a new trial based on newly-discovered evidence are as follows: (1) the new evidence would probably change the result; (2) it has been discovered since the trial; (3) it could not have been discovered before trial through the exercise of due diligence; (4) it is material to the issues in the case; (5) it is not merely cumulative; and (6) it is not merely impeaching or contradictory. *Mitchell v. Forster*, 59 N.M. 226, 282 P.2d 708 (1955); *Hill v. Burnworth*.

It appears that the new evidence in this case would probably change the result, if it is accepted by the trial court. Plaintiffs presented testimony of the owners of over 3500 shares of Westland's stock, who claimed that they did not sign the management proxies that were counted as management votes. Some of this testimony was somewhat equivocal; for example, Frank Candelaria, the owner of 2570 shares, changed his mind about whether he did not sign the management proxy at all or was "backed into" signing it. Even without Candelaria's votes, however, the election was close enough that the other witnesses' votes would probably have changed the result.

The new evidence was clearly discovered after the last special master meeting. It is also material to the issue in the case, which is, who legitimately won the election? It is not merely cumulative, because it is the only testimony concerning forged proxies in the case. It is not merely contradictory or impeaching.

There is room for contention, however, over whether the forged proxies could have been discovered before the end of the special master proceedings if plaintiffs had exercised due diligence. The only evidence on this issue is Page's testimony at trial

and what we can glean from the record proper. Page's testimony indicates that during the special master proceedings plaintiffs did not have an opportunity to closely examine the original proxies and did not have copies of the proxies to examine at their leisure. Plaintiffs had no reason to suspect that some of the signatures were forged until, by accident, they discovered an apparent forgery in early February. The last special master meeting was held on January 16.

In March, the trial court gave plaintiffs permission to obtain copies of the proxies, and they contacted a few hundred people to ask about their signatures and, allegedly, discovered that approximately one of every twenty-five management proxies was a forgery. They then made their motions to allow renewal of objections, which were denied.

The timetable revealed by the record shows that the election was held on November 16, and the process of counting the votes began soon after. December was filled with litigation, such as plaintiffs' requests for temporary restraining orders and an attempt by Westland to remove the case to federal court. The special master proceedings started in January and ended on the 16th of that month. Plaintiffs, therefore, had two months from the date of the election to the end of the special master proceedings to uncover the alleged forgeries. During that time, however, plaintiffs had no reason to suspect that the forgeries had occurred. Given the short period of time in which plaintiffs had to act, and the lack of any knowledge that forgery of proxies might be a problem, we believe that plaintiffs did exercise due diligence in making their challenges to proxies.

Based on the foregoing, it appears that plaintiffs have met the requirements for the grant of a new trial. *See Mitchell v. Forster; Hill v. Burnworth.* The trial court denied plaintiffs the opportunity to raise their objections to the formerly unchallenged proxies. The trial court's denial was based on considerations of the amount of time it would take to try to verify over 1800 signatures on proxies that had not

been challenged in the special master proceedings, and on the fact that plaintiffs had been urging the trial court to expedite the litigation so that the election dispute could be resolved. While concerns over the necessity for an expeditious resolution of a lawsuit of this type are valid, we believe they cannot overcome the requirement that each side be allowed a full and fair opportunity to litigate all material issues.

The present case involves a battle over control of a corporation and a debate over the direction that corporation should take in the future. The vote was extremely close, and frequent solicitations for votes were made in person, as well as through the mail. In such an atmosphere, it is likely that overreaching could occur by partisans of either side. To ensure a fair result in the election and to deter future misconduct of this sort, plaintiffs should have been allowed the opportunity to raise the issue of the asserted forgeries and have the trial court rule on their challenges to those proxies. We, therefore, reverse the trial court on this issue. On remand, both sides should be allowed to conduct discovery regarding the authenticity of proxy signatures and to cross-examine all witnesses presented by the other party.

### Manner of Signing Proxies

■ Plaintiffs challenge a number of proxies because of asserted deficiencies in the manner in which they were signed. They argue, first, that where shares are jointly owned, all owners must sign a proxy to make it valid. The trial court ruled that proxies signed by only one of two or more joint owners were presumptively valid, but that plaintiffs could overcome the presumption by presenting evidence to show that the missing joint owners did not agree with the vote evidenced on the proxies.

This approach seems fair and reasonable, and in accord with the reasoning adopted by other courts. *See Sellers v. Joseph Bancroft & Sons Co.*, 25 Del.Ch. 268, 17 A.2d 831 (1941) (where shares of stock are jointly owned, they may be voted at a shareholder's meeting by one of the joint owners, in the absence of apparent objection by any other owner). *Cf. Standard Power & Light Corp. v. Investment Assocs., Inc.*, 29 Del.Ch. 593, 51 A.2d 572 (1947) (where husband signed his wife's name to a proxy, the proxy would be prima facie valid in the absence of a showing that husband was not authorized to sign for wife).

The trial court's approach comports with the policy that stockholders should not be disenfranchised unless their purported vote is meaningless. *See Levin v. Metro-Goldwyn–Mayer, Inc.*, 43 Del.Ch. 168, 221 A.2d 499 (1966). We also agree that proxies of small shareholders in large companies should be scrutinized and evaluated so that the shareholders' wishes are not frustrated. *Cupo v. Community Nat'l Bank & Trust Co. of N.Y.*, 324 F.Supp. 1390 (E.D.N.Y.1971), *rev'd on other grounds*, 438 F.2d 108 (2d Cir.1971). The trial court's approach to these challenges was eminently reasonable, especially since plaintiffs were allowed the opportunity to produce evidence showing that the non-signing joint owner did not intend that the shares be voted in the way they were voted. Plaintiffs produced no such evidence.

■ A number of the proxies contained "signatures" that were printed instead of signed. Plaintiffs contend that these proxies are void as a matter of law. This contention is answered by *Costilla Estates Development Co. v. Mascarenas*, 33 N.M. 356, 267 P. 74 (1928). In *Costilla*, the supreme court interpreted a statute that directed the court clerk to sign filed papers. The clerk had stamped the papers with a rubber stamp instead of physically signing them. The supreme court concluded: "Generally a signature, if adopted as such, may be *printed*, lithographed, or typewritten, as well as written." *Id.* at 364, 267 P. at 77 (emphasis added). While this statement may have referred to a machine-printed signature as opposed to a hand-printed one, the principle is clear: if a party intends that the purported signature be a signature, it will be treated as such.

*Costilla* is in line with cases from other jurisdictions. *See, e.g., Schott v. Climax Molybdenum Co.*, 38 Del.Ch. 450, 154 A.2d 221 (1959) (use of a stamped facsimile sig-

nature is sufficient to cloak proxy with presumption of authenticity); *Board of County Comm'rs of Johnson County v. Kearney,* 8 Kan.App.2d 534, 661 P.2d 823 (1983) (signature may be by mark, initials, printed, stamped or typewritten). The trial court did not rule that the proxies were valid as a matter of law, but only that they were presumptively valid. Plaintiffs were allowed the opportunity to rebut that presumption with testimony from the shareholders whose names were printed. The trial court's ruling was correct.

### Counting Class B Shareholders' Votes

■ Plaintiffs argue that the votes reflecting Class B shares of stock should not have been counted in the candidates' totals. As the basis for this contention, plaintiffs rely on the fact that the voting list, prepared by Westland before the election, did not list the Class B shares and their owners. Plaintiffs argue that the list is prima facie evidence of those entitled to vote, and Westland's failure to include Class B shares and their owners in the list bars the validity of their votes. We disagree.

Plaintiffs' position would disenfranchise record owners of stock, who are entitled to vote, because Westland did not prepare a proper list of shareholders. The Class B shareholders are entitled to vote by law. NMSA 1978, § 53–11–33(A) (Repl.Pamp. 1983). They should not be disenfranchised by another's misfeasance or malfeasance. In addition, NMSA 1978, Section 53–11–31 (Repl.Pamp.1983), which specifies voting list requirements, provides in part: "Failure to comply with the requirements of this section does not affect the validity of any action taken at the [shareholders'] meeting." Combining the Class B owners' right to vote with this statement in the statute and the policy that shareholders should not be disenfranchised, we reach the conclusion that the trial court's ruling on this issue was correct. This is especially so because, as Westland contends and plaintiffs do not contest, all the Class B owners also held common stock, and so were included in the list of voters. The list simply did not reveal the extent of their Class B stock holdings. It appears, therefore, that plaintiffs had an opportunity to solicit votes from all of the owners of Class B stock and were not prejudiced by the omission of the Class B shares from the list of voters and shares entitled to vote.

### Double Proxies Issue

■ This is the first issue raised by Westland in its cross-appeal. Twenty-three shareholders executed nonmanagement proxies, then submitted later management proxies on which they checked the "No" box, indicating that they did not want their votes cast for the management candidates. One shareholder executed a nonmanagement proxy, then submitted a management proxy on which neither the "Yes" nor the "No" box was checked. The management proxy form specifically stated that "THIS PROXY REVOKES ALL PROXIES PREVIOUSLY GRANTED BY ME FOR ANY PURPOSE." Westland relies on this statement to argue that the later management proxies revoked the earlier nonmanagement proxies, so that the shareholders' votes should not have been counted for the nonmanagement candidates. Westland in effect argues that by submitting later-dated management proxies, with no box checked or the "No" box checked, the shareholders intended to abstain from the voting. The trial court ruled that the earlier nonmanagement "Yes" votes indicated a preference for the nonmanagement slate, and the subsequent "No" and blank management proxies indicated "No" votes for that slate and were not abstentions. The trial court stated that these rulings only established presumptions that the votes were intended to be nonmanagement votes and that Westland could rebut that presumption. Westland did not attempt to do so with respect to any of the proxies.

Westland relies on the explicit language of the management proxies and on the principle that a later proxy revokes an earlier one. *See, e.g., Burleson v. Hayutin,* 130 Colo. 58, 273 P.2d 124 (1954) (En Banc) (proxy may be revoked by giving later proxy to another). However, under the circumstances surrounding these proxies and considering that the offer-of-proof testimony shows that many of these share-

holders are not sophisticated and are not large shareholders, we believe the trial court's approach was correct. Establishing a presumption that the shareholders intended to vote for the nonmanagement candidates appears to have carried out the shareholders' intentions in submitting the proxies as they did. This equitable result is in accordance with our earlier discussion of the rationale that proxies of small shareholders of a corporation should be scrutinized and evaluated so that the shareholders' wishes are not frustrated. *Cupo v. Community Nat'l Bank & Trust Co. of N.Y.* We affirm the trial court's holding on this issue.

*Sotero Salazar's Proxy*

■ Westland argues that the trial court erred by ruling that Sotero Salazar's votes would be counted for the nonmanagement slate. Westland contends that Salazar's deposition showed that he intended to vote for the management candidates, that the trial court had earlier ruled that Salazar's intent would determine how his votes would be counted, and that the trial court thus erred in its determination that the votes should be added to plaintiffs' total. Westland maintains that since the trial court looked to shareholder intent in deciding that later-submitted "No" votes for management candidates should not supersede earlier "Yes" votes for nonmanagement candidates, the trial court should have effectuated Salazar's intent also. We agree.

The first proxy signed by Salazar voted in favor of the management candidates; the second voted for the nonmanagement candidates. It appears from the findings the trial court counted Salazar's shares in favor of nonmanagement on the basis that the later-signed proxy controlled. While Salazar's later-submitted proxy was not blank, or a "No" vote for the slate on the proxy, as was the case of the proxies discussed in the previous section, we believe that consistency requires that Salazar's intent controls.

■ Ordinarily, the trial court is the proper arbiter of the credibility of witnesses and the testimony. *See Farmers &*

*Stockmens Bank of Clayton v. Morrow,* 81 N.M. 678, 472 P.2d 643 (1970). However, where, as here, the testimony is by deposition, this court is in just as good a position as the trial court to evaluate Salazar's testimony. In any event, it is not clear that the trial court considered Salazar's intent in making its ruling. *See Cupo v. Community Nat'l Bank & Trust Co. of N.Y.* Since we hold that intent should control, we have examined Salazar's deposition and determine that it evinces a clear intent to vote for the management candidates. Moreover, Salazar's deposition indicates that the later-signed proxy may have been obtained through misrepresentation. Therefore, on remand, Salazar's votes are to be counted in favor of management.

*Edmund Chavez's Proxy*

■ Edmund Chavez attempted to split his votes among the three nonmanagement candidates and one of the management candidates. He sent in two proxies and marked the number of shares that he wanted voted on each one. The trial court refused to give effect to his attempt to vote for one of the management candidates, instead ruling that all of his shares would be counted as votes for the nonmanagement slate. The trial court's decision was apparently based only on the fact that the nonmanagement proxy was dated later than the management proxy.

The trial court's refusal to give effect to the shareholder's intent is inconsistent with the trial court's rulings on other issues raised by the parties. Chavez clearly marked on his proxies the number of shares he wished voted for the various candidates. The parties have not directed us to any authority preventing him from doing so, as long as his votes were not cumulated. Therefore, he should have been able to split his shares among the candidates for whom he wanted to vote. The trial court's refusal to allow him to do so is reversed, and the trial court is directed to determine Chavez's intent in casting his votes and enter a decision in accordance with that intent.

*Expenses of Special Master Proceedings*

Westland argues that the expenses of the special master proceedings should have been assessed to plaintiffs and not to Westland. Westland's argument is based on the fact that Pena, and not Westland, asked for the appointment of the special master, and on the contention that there is no evidence supporting the trial court's finding that judicial intervention was necessary to obtain a fair and accurate vote count.

SCRA 1986, 1–053(A) (Supp.1987) states that "[t]he compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties * * * as the court may direct." This rule gives a trial court the discretion to decide who should bear the burden of paying the special master's fees and other expenses of the special master proceedings. In addition, as Westland acknowledges, the matter of assessing costs lies within the discretion of the trial court and will not be reversed on appeal except for abuse of that discretion. *Baca v. Marquez,* 105 N.M. 762, 737 P.2d 543 (Ct.App.1987); *see* SCRA 1986, 1–054(E) ("[C]osts shall be allowed as a matter of course to the prevailing party unless the court otherwise directs * * *.").

■ This case involved a bitterly contested and extremely close proxy fight between rival shareholder factions. The trial court was asked to intervene in the proceedings twice in one month. Appointment of a special master to control the matter and conserve the trial court's resources was a proper way to deal with the situation. The proceedings involved a number of challenges to many proxies, based on a number of different grounds. Under these circumstances, we do not believe the trial court abused its discretion by determining that the special master proceedings were necessary to ensure a well-regulated vote count and that Westland should bear the costs of those proceedings. In so ruling, we do not intend to restrict the trial court in allocating costs on remand.

## CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment in part and af-

firm in part. The matter is remanded to the trial court for further proceedings consistent with this opinion. Plaintiffs' motion requesting oral argument is denied because we deem oral argument unnecessary. *Garcia v. Genuine Parts Co.,* 90 N.M. 124, 560 P.2d 545 (Ct.App.1977).

IT IS SO ORDERED.

GARCIA and FRUMAN, JJ., concur.