This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-36776

**LEO L. PADILLA,**

      Worker-Appellant,

v.

**CORESLAB STRUCTURES and
VALLEY FORGE INSURANCE
COMPANY,**

      Employer/Insurer-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION Reg C. Woodard, Workers' Compensation Judge**

Patrick Larkin Fogel
Albuquerque, NM

for Appellant

Elmore Law, LLC
Christopher T. Elmore
Albuquerque, NM

for Appellees

### MEMORANDUM OPINION

**M. ZAMORA, Judge.**

**{1}** Worker Leo L. Padilla filed for workers' compensation benefits following a work-related accident while employed with Coreslab Structures Inc. (Employer). The workers' compensation judge (WCJ) granted Worker temporary total disability (TTD) benefits from October 4, 2011 to February 2, 2012 for his right shoulder, but denied benefits for any other alleged injury. The WCJ also denied Worker any permanent partial disability

(PPD) benefits. Worker appeals the WCJ's order, contending that it is not supported by substantial evidence and that the WCJ misapplied the law. We affirm.

**BACKGROUND**

**{2}** On October 4, 2011, Worker was injured when he fell off a scaffold while acting within the course and scope of his employment with Employer. Worker filed for workers' compensation benefits. The parties do not dispute the accident itself, but rather dispute the nature, extent, and causation of Worker's alleged injuries. The parties waived trial on the merits and agreed that the WCJ would adjudicate the case on the previously admitted evidence and evidence presented through the addendum to the pre-trial order.

**{3}** On appeal, Worker's arguments can be categorized into three points of error: (1) substantial evidence does not exist to support the WCJ's finding that the right shoulder was the sole compensable injury because there are other compensable injuries; (2) the WCJ failed to apply the correct legal standard in determining whether to award medical benefits; and (3) the WCJ failed to apply the correct legal standard in determining whether to award PPD benefits. We address each issue in turn.[1]

**DISCUSSION**

**{4}** We review workers' compensation claims under a whole record standard of review by determining whether substantial evidence in the record as a whole supports the WCJ's conclusion. *See Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 12, 146 N.M. 453, 212 P.3d 341. Substantial evidence is credible evidence in light of the whole record "that is sufficient for a reasonable mind to accept as adequate to support the conclusion[.]" *Id.* (internal quotation marks and citation omitted). We give deference to the WCJ as fact-finder and view the evidence in the light most favorable to the decision without disregarding contravening evidence. *Id.*

**{5}** "While we generally may not weigh the evidence, even under whole record review, such review allows the reviewing court greater latitude to determine whether a finding of fact was reasonable based on the evidence." *Maez v. Riley Indus.*, 2015-NMCA-049, ¶ 10, 347 P.3d 732 (alteration, internal quotation marks, and citation omitted). Such review "has even greater latitude when reviewing an issue for which the evidence is documentary in nature." *Id.* As in this case, "when all or substantially all of the evidence on a material issue is documentary or by deposition, an appellate court may examine and weigh it." *Id.* (alteration, internal quotation marks, and citation omitted). That is because "[w]here the issue to be determined rests upon interpretation of documentary evidence, [appellate courts are] in as good a position as the trial court to determine the facts and draw [their] own conclusions." *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 13, 303 P.3d 814 (internal quotation marks and citation

---

1 Worker raises many new arguments for the first time in his reply brief, which we do not address. *See Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶ 29, 127 N.M. 282, 980 P.2d 65 (stating that, generally, the Court will not consider an argument raised for the first time in a reply brief, unless it is directed to new arguments or authorities presented in the answer brief).

omitted); *see Pena v. Westland Dev. Co.*, 1988-NMCA-052, ¶ 34, 107 N.M. 560, 761 P.2d 438 (explaining that ordinarily the district court is the "proper arbiter of the credibility of witnesses and the testimony," except where the testimony is by deposition, in which case this Court may evaluate testimony and credibility). Still, we will not disturb the WCJ's findings unless they are "manifestly wrong or clearly opposed to the evidence." *Maez*, 2015-NMCA-049, ¶ 10 (internal quotation marks and citation omitted).

{6}     Here, the WCJ found that Worker is entitled to TTD benefits for his right shoulder injury from October 4, 2011 until February 2, 2012, the date of Dr. Reeve's finding of Medical Maximum Improvement (MMI).[2] The WCJ also found that Worker is not entitled to PPD benefits following February 2, 2012, seemingly also based at least in part on Dr. Reeve's assessment. Further, the WCJ concluded that "Worker's established lack of credibility irreversibly taints any medical testimony in support of medical benefits by health care providers following February 2, 2012." The WCJ determined that medical care Worker sought after February 2, 2012, was "based in large part [] upon false, inaccurate[,] and exaggerated medical claims." Ultimately, the WCJ determined that Worker failed to meet his burden of proof by credible medical testimony that he has a permanent impairment as a result of the October 4, 2011 accident, and as a consequence, Worker is not entitled to PPD benefits.

{7}     We first address whether there was substantial evidence to support the WCJ's finding that the right shoulder was the sole compensable injury. Concluding that there is substantial evidence that the right shoulder is the only compensable injury, we review whether the WCJ misapplied the law when it did not grant Worker medical benefits after February 2, 2012, and PPD benefits for the right shoulder.

## I.     Substantial Evidence Supports the WCJ's Finding That the Right Shoulder is the Sole Compensable Injury

{8}     In order to receive benefits under the Workers' Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2017), a worker must "sustain[ ] an accidental injury arising out of and in the course of his employment[.]" Section 52-1-28(A)(1). In cases where the employer disputes a causal connection between the accident and disability, Section 52-1-28(B) requires the worker to establish causation "as a probability by expert testimony of a health care provider." "The testimony of a qualified health care provider must establish, to a reasonable medical probability, that a causal relationship exists between the accident and disability." *Trujillo v. Los Alamos Nat'l Lab.*, 2016-NMCA-041, ¶ 17, 368 P.3d 1259. The language required to convey a reasonable medical probability "need not [be offered] in positive,

_____

2 We note some discrepancy in the record regarding the date of MMI. Dr. Reeve's report and deposition state that he found Worker at MMI on February 17, 2012. The WCJ's order bases its finding on MMI on Dr. Reeve's recommendation, but states the date is February 2, 2012. We also note that Worker seeks medical treatment after February 2, 2012, but the pre-trial order states that the parties stipulated that Worker was paid indemnity benefits from October 2, 2011 to February 15, 2012. In any event, Worker does not challenge this discrepancy and the dates do not affect our analysis.

dogmatic language or in the exact language of the statute[,]" but it must permit "a reasonable inference that the disability is the natural and direct result, as a medical probability, of the accident." *Gammon v. Ebasco Corp.*, 1965-NMSC-015, ¶¶ 22-23, 74 N.M. 789, 399 P.2d 279. "Causation exists within a reasonable medical probability when a qualified medical expert testifies as to his opinion concerning causation and, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." *Sanchez v. Molycorp, Inc.*, 1985-NMCA-067, ¶ 16, 103 N.M. 148, 703 P.2d 925.

{9}     "While Sections 52-1-28(A)(3) and (B) appear to require a single causation analysis (between the accident and the disability), embedded within that analysis is the requirement that there be an injury that is causally connected to both the accident and the disability." *Molinar v. Larry Reetz Constr., Ltd.*, 2018-NMCA-011, ¶ 21, 409 P.3d 956, *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-36739, Dec. 2017). "Thus, Section 52-1-28 must be understood as requiring the worker to establish that (1) a work-related accident caused an injury or injuries, and (2) the injury resulted in disability." *Id.* In this case, we are focused on the first requirement—whether the work-related accident caused each of Worker's claimed injuries.

{10}     The WCJ found the right shoulder to be the only compensable injury. On appeal, Worker argues that substantial evidence does not exist to support this finding that the right shoulder was the *sole* compensable injury. We understand Worker's argument on appeal to be that there was substantial evidence that Worker sustained other compensable injuries to his "neck, both shoulders, low back, left wrist, left hip, brain, left eye, vestibular system[,] and both knees." Thus, we turn to whether Worker established a causal connection between the accident and his injuries. *See Molinar*, 2018-NMCA-011, ¶ 21 ("Where a worker sustains multiple injuries as a result of one accident, a causal connection between the accident and *each* injury must be established in order for the injury to be compensable." (emphasis added)).

{11}     Dr. Reeve, board certified in physical medicine and one of Worker's treating physicians, first saw Worker on October 17, 2011. Dr. Reeve examined Worker and concluded Worker suffered a closed-head trauma resulting in post-concussive syndrome. Based on this initial examination, Dr. Reeve ordered MRIs of Worker's hip, shoulder, head, cervical spine, and lumbar spine, and requested a neuropsychologic evaluation with Dr. Chiulli for cognitive deficits. Dr. Reeve testified to the results of the MRIs. The left shoulder MRI showed tendinitis with a full thickness tear in the supraspinatus, but no muscle atrophy. The right shoulder MRI showed "severe AC arthrosis with periarticular osteopenia, pericapsular edema, soft swelling, subscapularis tendinopathy, a longitudinal interstitial split tear, and medially perched, long head biceps tendon, and . . . a split tendon tear in the long head of the biceps." After reviewing the MRI of both shoulders, Dr. Reeve believed within a reasonable degree of medical probability that Worker had bilateral rotator cuff tears and would need to see a shoulder specialist. Dr. Reeve related the right shoulder conditions to the October 4, 2011 accident. The MRI of the low back gave Dr. Reeve the impression that Worker had radiculopathy with probable S1 nerve root compression which he also found on the

physical exam. Dr. Reeve testified that the anterolisthesis with the defect was related to the October 4, 2011 accident. After reviewing the MRI of the cervical spine, Dr. Reeve believed Worker had suffered a disc herniation with stenosis, and stenosis with ventral cord impingement which probably resulted in radiculopathy. Dr. Reeve testified he believed those conditions to be related to the October 4, 2011 accident. Dr. Reeve testified that the MRI of the left knee showed degenerative conditions and fraying of the meniscus that may have been work-related and may have been due to the accident. Dr. Reeve opined that he did not see anything in the hip MRI that he could directly relate to the fall except for stress reaction at the left SI joint. Regarding the left wrist MRI, Dr. Reeve testified that based on the fall, Worker had bled into the wrist joint, had swelling throughout the area and had a cartilage tear of his TFCC. The brain MRI completed on November 1, 2011, showed that the brain was normal. Dr. Reeve referred Worker to Dr. Pachelli, an orthopedist, Dr. Rice for his spine, Dr. Cannon for vision, and Dr. Chiulli for a neuropsychological evaluation.

{12}    Dr. Pachelli, an orthopedic surgeon, first evaluated Worker on December 7, 2011. Dr. Pachelli performed a physical examination and assessed that Worker suffered a left rotator cuff tear, right AC arthritis/pain, right rotator cuff degeneration, myofascial pain syndrome, and cervicalgia. Dr. Pachelli concluded that surgery was not recommended at the time because "[h]e needs to get all of the problems with his neck, etc. resolved before dealing with his shoulder." On January 6, 2012, Dr. Pachelli had a follow-up visit with Worker and concluded that Worker's gait and station were normal, and his muscle strength and sensation were normal. Dr. Pachelli's assessment was that Worker had internal derangement of knee and chondromalacia of patella bilateral and recommended continued use of a left knee brace and a conditioning program. On February 6, 2012, Dr. Pachelli on another follow-up visit with Worker regarding the left shoulder concluded that surgery is not recommended because he did not think any surgical intervention would help.

{13}    Dr. Rice, a pain specialist, treated Worker for cervical and lumbar pain on December 8, 2011. Dr. Rice completed a physical examination and determined that Worker was a candidate for cervical epidural steroid injection. Dr. Pachelli reported that after Dr. Rice's injections, Worker stated his pain was not improving.

{14}    Dr. Cannon, an ophthalmologist, certified in neuro-ophthalmology, examined Worker on December 13, 2011. Worker presented to Dr. Cannon complaining of "increased visual acuity with floaters . . . and light sensitivity in the left eye." Dr. Cannon concluded that he saw "no reason for his visual loss on the left side" and that "in the future this will resolve itself and [] will be [] 20/20."

{15}    On January 24, 2012, Dr. Chiulli, Ph.D., a clinical neuropsychologist, saw Worker for a neuropsychological evaluation. Worker completed four tests and Dr. Chiulli concluded that "[a]ll of the tests administered indicate the probability of intentionally produced impairment of performance" and that Worker was malingering.

**{16}** Dr. Reeve's final visit with Worker was on February 17, 2012, when he discharged Worker, concluding that Worker was at MMI. Dr. Reeve's report revealed that Dr. Chiulli's neuropsychological test indicated "fained illness." Additionally, Dr. Reeve was persuaded by Dr. Pachelli's determination that Worker was not a surgical candidate. Dr. Reeve concluded "based upon these reports, [he had] nothing further to offer [Worker] with regards to his closed head injury" and that Worker had reached MMI. Dr. Reeve reported that his final impression of Worker included: a rotator tear, cervical strain, non-surgical candidate, and exaggerated responses with fained behavior.

**{17}** Later that year in the summer of 2012, Worker began receiving medical care for cognitive issues. On June 22, 2012, Worker presented to the emergency department at UNM with complaints of intermittent memory loss, syncope, dizziness, and headache. Worker denied any new head trauma since the injury of October 4, 2011. A head CT was obtained and it revealed no abnormality and no MRI explanation for memory loss. An MRI of the brain on July 8, 2012, at UNM revealed posterior changes with encephalomalacia and gliosis. Dr. Thoma, Ph.D., a neuropsychologist in the UNM neuropsychology department completed a neuropsychological evaluation of Worker on November 7, 2012. Dr. Thoma identified "global impairment across measures, with severe to profound impairment noted on measures of executive functioning and motor function Dr. Seelinger, a neurologist, reported, after speaking with Dr. Rupp, a neuroradiologist, that there must have been an intervening event between October 4, 2011, and the June 2012 CT scan. Dr. Seelinger explained that there was no full blown encephalomalacia on the June 2012 CT scan, as there was on the October 2012 MRI at UNMH. Dr. Seelinger stated that this fits with the consideration of an additional injury since encephalomalacia takes weeks to months to develop in the form as demonstrated on the October 2012 MRI.

**{18}** Dr. Berger, a neurologist, opined to a reasonable degree of medical certainty that the October 4, 2011 fall did not cause the CT and MRI findings of the summer 2012, but rather, "something else must have happened." Dr. Berger concluded that another trauma probably occurred after February 2012 to cause the brain injury. Dr. Whalen, board certified in internal medicine and anesthesiology, disagreed with this conclusion and opined that the brain injury stemmed from the October 4, 2011 injury, and any other falls causing trauma were the result of the October 4, 2011 injury. Dr. Whalen testified that encephalopathy can show up anywhere from six weeks to a year afterward so an MRI three or four months after the accident might not necessarily tell the whole story.

**{19}** Dr. Taghizadeh, an ear, nose, and throat doctor, opined that Worker had damage to the vestibular system and that the traumatic brain injury from October 4, 2011, contributed to the dysfunction. In reaching his conclusion, Dr. Taghizadeh explicitly relied on Worker giving truthful information.

**IME Panels**

**{20}** Two Independent Medical Evaluation (IME) panels were conducted. The first IME report (First IME Panel) was reported on December 15, 2014. Worker filed a motion to

strike the First IME Panel opinion in part because, he alleged, the panel did not have three hundred and nine pages of medical records submitted by Worker. On October 23, 2015, the WCJ did not strike the First IME Panel report, but rather, sua sponte ordered a second IME (Second IME Panel) to take place. This Second IME Panel reported on March 25, 2016.

**{21}** The First IME Panel reviewed most of Worker's medical records, performed examinations on Worker, and administered tests for a neuropsychological exam. The panel concluded that it was "unable to attribute any physical injury to October 4, 2011 workplace injury." The panel stated: "It is our professional opinion that with [Worker's] bizarre reports of symptoms and examination that [Worker's] presentation is either a psychological diagnosis [or] fraudulent." Dr. Granados, a neuropsychologist, of the panel also concluded: "Given the current and available medical record, the neuroimaging findings obtained at UNM in June 2012 and confirmed in October 2014 are not considered related to the work injury of [October 4, 2011]. Therefore, neuropsychological impairment related to those neuroradiological findings are not considered work-related." The panel concluded that Worker was at MMI on February 17, 2012, as Dr. Reeve's records indicated.

**{22}** Worker argues on appeal, as he did below, that "[s]ince the [F]irst [IME] [P]anel was missing 309 pages of medical records from UNMH, all of Dr. Whalen's records, did not review the MRI and [CT] scans taken at UNMH in 2012 through 2014, and did not perform a complete physical examination, the [F]irst [IME] [P]anel does not meet the standards of §52-1-28(B) and the opinion is not admissible." However, as we have held, our case law does not impose a requirement that a testifying expert have reviewed all of a worker's prior medical records in order to provide a competent causation opinion. *See Molinar*, 2018-NMCA-011, ¶ 40. Section 52-1-28(B)'s requirement is simply that the worker must establish, by expert testimony of a healthcare provider, causal connection as a probability. The healthcare providers of the First IME Panel were provided with the pertinent information to reach an expert opinion. Thus, the WCJ did not err in rejecting Worker's motion to strike the First IME Panel, and we are not persuaded that the First IME Panel's lack of *all* of Worker's medical records negatively affects the First IME Panel's opinion. *See Molinar*, 2018-NMCA-011, ¶ 40 (holding that the weight of a testifying doctor's testimony was not negatively impacted by the fact that he had not reviewed all of the worker's medical records prior to rendering his causation opinion "because the record ma[de] clear that he possessed pertinent information about [the w]orker's prior injury when he gave his opinion").

**{23}** The Second IME Panel's report from March 25, 2016, is harder to review, as there is not a singular opinion of the panel, but rather, different healthcare providers answered different questions. As part of the Second IME Panel, the healthcare providers issued the following opinions. Dr. Romanelli, an orthopedic surgeon, opined—to a reasonable medical probability—that Worker's (1) left shoulder rotator cuff tear; (2) right shoulder mild AC joint sprain; (3) left hip gluteal contusion; and (4) left wrist diffuse sprain with capsulitis were caused by the October 4, 2011 accident. Dr. Saiz, an orthopedic spine surgeon, opined—to a reasonable medical probability—that Worker's

low back strain/sprain was caused by the October 4, 2011 accident. Dr. Berger, a neurologist, opined—to a reasonable medical probability—that Worker's persistent cognitive problems were unrelated to the October 4, 2011 accident. Dr. Naimark, a psychologist, opined—to a reasonable degree of psychological probability—that Worker's diagnoses of somatic symptom disorder and unspecified anxiety disorder were a result of the October 4, 2011 accident. Dr. Swanda, a clinical neuropsychologist, opined—to a reasonable degree of neuropsychological certainty—that Worker's diagnosis of mild neurocognitive disorder due to TBI was caused by the October 4, 2011 accident. Dr. Delahoussaye, board certified in physical medicine and rehabilitation, opined—to a reasonable medical probability—that Worker's (1) concussion and resulting cognitive impairments; (2) left shoulder full thickness rotator cuff tear; (3) left knee class 2-3 chondral ulcer; (4) cervical sprain; (5) thoracic sprain; (6) lumbar sprain; (7) left wrist sprain; (8) right shoulder A-C joint arthropathy; (9) major depressive disorder; (10) anxiety disorder; and (11) post-traumatic headaches were related to the October 4, 2011 fall.

**{24}**    The WCJ considering both panels, concluded that the Second IME Panel was "worthless" as it was infused with falsehoods from Worker. The WCJ concluded that the Second IME Panel "reviewed medical records infused with Worker's falsehoods, misrepresentations and exaggerations so as to render the opinions of the panelists unreliable for purposes of this matter." The WCJ also concluded that the Second IME Panel was "unreliable taken as a whole" because the panel lacks an "opinion of the panel" but rather consists of different doctors answering different IME questions. Rather, the WCJ, concluded: "Upon review of the medical evidence, the observations of the [First IME Panel] during their examination (which are not dependent upon any medical records) of Worker have considerable weight."

### Credibility

**{25}**    The WCJ also looked to the credibility of the witnesses and determined that Worker was not credible. The WCJ found that "Worker established a pattern of lying to his doctors about his abilities and extent of injury[.]" For example, as the WCJ explained, Worker gave varying descriptions of his fall over time. First, Worker reported that he fell ten to twelve feet from the ladder to the ground. Six days later, he told his doctor that he fell twelve feet. On October 17, 2011, Worker reported to Dr. Reeve that he fell thirteen feet. On October 15, 2012, Worker told the UNMH neuropsychology department that he fell sixteen to nineteen feet. Worker's recitation of the distance he fell increased over time until on December 19, 2012, he reported to the UNMH neuropsychology department that he fell three stories

**{26}**    Worker also presented inconsistent information regarding his physical abilities and injuries. Worker claimed to multiple doctors and testified in his deposition that he was unable to work and that he has not worked since the October 4, 2011 accident. However, surveillance video entered into evidence by Employer revealed that Worker was able to work on-site construction during the times he explicitly claimed he was not.

**{27}** Notably, Dr. Chiulli concluded that Worker was malingering and indicated a probability of intentionally produced impairment of performance. Indeed, the neurologists from both IMEs opined that Worker's encephalomalacia was not related to the work-accident.

**{28}** Based on the above, the WCJ concluded that "[t]he evidence supports finding Worker has repeatedly and intentionally provided false testimony and discovery responses in the course of this matter[.]" The WCJ concluded that "Worker's lies and exaggerations undermine the opinions of any of Worker's healthcare providers" and "[m]edical opinions based upon incorrect or incomplete history are not binding on the finder of fact." Accordingly, the WCJ determined that the opinion of the Second IME Panel was "unreliable for purposes of this matter" because the panel "reviewed medical records infused with Worker's falsehoods, misrepresentations and exaggerations." Based on the above, we agree with the WCJ's conclusion that Worker is not credible.[3] *See Maez*, 2015-NMCA-049, ¶ 10 ("[W]e will not disturb the WCJ's findings unless they are manifestly wrong or clearly opposed to the evidence.").

**{29}** Nevertheless, Worker points to the testimony of Dr. Reeve, Dr. Berger, and Dr. Taghizadeh as evidence of causation of the accident and the injuries. Specifically, Worker argues these doctors reveal that reviewing these records, a reasonable man "would reasonabl[y] conclude that Worker sustained compensable injuries to his neck, both shoulders, low back, left wrist, left hip, brain, left eye, vestibular system[,] and both knees." Worker contends that the medical testimony of these doctors was "uncontroverted" and thus falls into the uncontradicted medical evidence rule. *See Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 35, 134 N.M. 421, 77 P.3d 1014 ("The [uncontradicted medical evidence] rule is based on [Section] 52-1-28(B), which requires the worker to prove causal connection between disability and accident as a medical probability by expert medical testimony. Because the statute requires a certain type of proof, uncontradicted evidence in the form of that type of proof is binding on the trial court." (internal quotation marks and citation omitted)). However, the uncontradicted medical evidence rule "is not applicable when a worker's evidence is in fact contradicted by other evidence." *Banks*, 2003-NMSC-026, ¶ 35. Additionally, "[u]ncontradicted testimony need not be accepted as true if [] the witness is shown to be unworthy of belief[.]" *Hernandez v. Mead Foods, Inc.*, 1986-NMCA-020, ¶ 14, 104 N.M. 67, 716 P.2d 645. The rule does not apply in this case because, as we have discussed, the evidence Worker relies on is contradicted by other evidence of healthcare providers based on Worker's testimony and explanations about his condition which have been shown to be not credible. Additionally, Worker's argument that the WCJ erred because a reasonable man could reasonably conclude his injuries were compensable misstates the law. The WCJ was presented with conflicting expert evidence from healthcare

---

[3] Worker also takes issue with the WCJ's credibility determination, contending that because he has a brain injury, he cannot form the scienter to lie and therefore this credibility determination is incorrect. We do not address this argument because it is undeveloped and lacks cited authority. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed."); *ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (explaining that this Court will not consider propositions that are unsupported by citation to authority).

providers of the injuries' causation. The job of the WCJ is to weigh this conflicting testimony. *See Turner v. N.M. State Highway Dep't*, 1982-NMCA-097, ¶ 13, 98 N.M. 256, 648 P.2d 8 ("Although the opinions of the expert medical witnesses were conflicting, and the evidence cited by plaintiff could have supported a different conclusion by the trial court, it is not a prerogative of this [C]ourt on appeal to weigh the testimony of medical experts, but rather to ascertain whether there is substantial evidence to support the trial court's evaluation of the evidence and determination of where the truth lies[.]" (internal quotation marks and citation omitted)). There was substantial evidence to support the WCJ's determination that the other injuries were not compensable because they were not causally linked to the October 4, 2011 accident. Accordingly, we hold there is substantial evidence to support the WCJ's determination that the right shoulder was the only compensable injury.

## II.    The WCJ Did Not Misapply the Law When it Did Not Grant Worker Medical Benefits for Treatment After February 2, 2012

**{30}**    Worker seeks indemnity benefits for medical treatment after January 1, 2013. Worker argues on appeal that the WCJ misapplied the law when it failed to award medical treatment to Worker after February 2, 2012. Worker contends that the WCJ was "without authority to limit or restrict future medical benefits once a compensable injury is established."

**{31}**    Under the Act, Worker has the burden to establish that the requested medical care is reasonable, necessary, and causally connected to the work accident. *See* § 52-1-28(B); § 52-1-49(A) (providing that "[a]fter an injury to a worker . . . and continuing as long as medical or related treatment is reasonably necessary, the employer shall . . . provide the worker in a timely manner reasonable and necessary health care services from a health care provider"); *Davis v. Los Alamos Nat'l Lab.*, 1989-NMCA-023, ¶ 4, 108 N.M. 587, 775 P.2d 1304 ("Claimant has the burden of showing that the [medical] expenses were both reasonable and necessary."); *Hernandez v. Mead Foods, Inc.*, 1986-NMCA-020, ¶ 23, 104 N.M. 67, 716 P.2d 645 (holding that "the medical benefits for which recovery is sought must be incidental to and a concomitant part of the injury sustained in a work-related accident"). Worker has only demonstrated that one injury is causally connected to the work accident: the right shoulder. Thus, we review Worker's claims for medical benefits for this injury only. *See Vargas v. City of Albuquerque*, 1993-NMCA-136, ¶ 9, 116 N.M. 664, 866 P.2d 392 (affirming the WCJ's denial of medical benefits where the WCJ found that the worker "did not sustain any injury" in the work-related accident because an employer "is only obligated to provide services after an injury").

**{32}**    The First IME Panel concluded that no more medical treatment was reasonable and necessary. Specifically, the panel stated that Worker does not require any ongoing future treatment to treat causally related physical work-related injuries. The panel determined that there were no medical conditions causally related that would worsen. The WCJ concluded that Employer is not liable for medical bills incurred by Worker after February 2, 2012.

**{33}** Our review of the record does not reveal any evidence regarding any reasonable and necessary medical treatment Worker has incurred for the right shoulder from February 2, 2012 to present. Worker does not point us to any such evidence, nor did he seek future medical expenses. We therefore cannot conclude that the WCJ misapplied the law by failing to award medical treatment to Worker from February 2, 2012 to present.

**{34}** To the extent Worker argues that the WCJ misapplied the law in denying him *future* medical benefits, Worker misconstrues the record. It is true that the WCJ "is without authority to limit or restrict in advance future medical benefits once a compensable injury is established." *Graham v. Presbyterian Hosp. Ctr.*, 1986-NMCA-064, ¶ 3, 104 N.M. 490, 723 P.2d 259. "Since the trial court cannot practically determine the worker's future medical needs at the time of entry of a judgment finding disability, Section 52-1-49 authorizes entry of a judgment directing the payment of a worker's reasonable and necessary future medical expenses and invests the court with continuing jurisdiction to enforce such orders." *St. Clair v. Cty. of Grant*, 1990-NMCA-087, ¶ 14, 110 N.M. 543, 797 P.2d 993. It follows logically that Worker is not entitled to relief for any future medical benefits for the uncompensable injuries. *Graham*, 1986-NMCA-064, ¶¶ 5-6 (affirming our rule that a plaintiff is not entitled to a judgment for future medical benefits which have no relation to the work-related injury). Otherwise, the WCJ concluded that Worker's lack of credibility irreversibly tainted any medical benefits sought after February 2, 2012, and that Employer is not liable for medical bills incurred by Worker after February 2, 2012. We note that there is nothing in the WCJ's order to prohibit Worker from requesting reasonable and necessary medical benefits for the right shoulder in the future. We conclude the WCJ did not misapply the law by not granting Worker previous or future medical benefits for the right shoulder.

### III. The WCJ Did Not Misapply the Law When it Denied Worker PPD Benefits

**{35}** The WCJ concluded that Worker is not entitled to PPD benefits following February 2, 2012, citing Dr. Reeve's opinion that no impairment rating was appropriate as of February 2, 2012. The WCJ concluded that "Worker failed to meet his burden [of] proof by credible medical testimony that he has a permanent impairment as a result of the October 4, 2011 fall, and as a consequence, Worker is not entitled to [PPD] benefits." On appeal, Worker argues that the WCJ misapplied the law when it denied him PPD benefits.

**{36}** Section 52-1-26(B) defines "partial disability" as "a condition whereby a worker, by reason of injury arising out of and in the course of employment, suffers a permanent impairment." "[PPD] is calculated pursuant to a statutory formula, § 52-1-26(C), and not in accordance with the worker's ability or inability to function at work." *Smith v. Arizona Pub. Serv. Co.*, 2003-NMCA-097, ¶ 15, 134 N.M. 202, 75 P.3d 418. "In cases where a worker claims PPD, the relevant question is whether the worker has established a causal connection between his accident and a permanent impairment." *Molinar*, 2018-NMCA-011, ¶ 25. Again, we only examine whether the WCJ misapplied the law in not granting PPD for the compensable right shoulder injury.

**{37}** We first note that the only evidence regarding the right shoulder and PPD that Worker points us to is Dr. Romanelli's testimony whereby he opined that Worker's right shoulder rotator cuff tear was not related to the October 4, 2011 accident, but rather was "more of a genetic . . . degenerative process." Moreover, Dr. Reeve opined that Worker had no impairment rating. Without an impairment of a compensable injury, Worker cannot receive PPD benefits. The WCJ did not misapply the law in denying the PPD benefits because Worker showed no causal connection between his accident and a permanent impairment. *See Molinar*, 2018-NMCA-011, ¶ 25.

**{38}** Worker also contends, with no citation to the record, that the WCJ was "without authority to assign an average weekly wage, and compensation rate that was different than the stipulated rate offered by the [p]arties through the [p]re[-t]rial order." With no impairment finding, the calculation rate does not make an impact and we need not reach this argument.

### IV.    Worker's Additional Arguments

**{39}** Any additional arguments that Worker makes that we have not addressed assume that Worker's other injuries are compensable. Because we hold there is substantial evidence to support the WCJ's determination that the right shoulder was the only compensable injury, we need not address these arguments.

### CONCLUSION

**{40}** For the foregoing reasons we affirm the WCJ's order.

**{41}    IT IS SO ORDERED.**

**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

**JULIE J. VARGAS, Judge**

**JACQUELINE R. MEDINA, Judge**