**Charles M. SATTERFIELD, III, Plaintiff,**

v.

**MONSANTO COMPANY and Solutia, Inc., Defendants.**

No. 98 Civ. 8040 LLS.

United States District Court, S.D. New York.

March 27, 2000.

Joseph A. Barbaccia (of counsel), Law Offices of Joseph A. Barbaccia, Freeport, NY, for plaintiff.

Robert R. Reed, Louis F. Bonacorsi (of counsel), Bryan Cave, LLP, New York City, for defendants.

## Opinion and Order

STANTON, District Judge.

Defendants move for summary judgment dismissing all of plaintiff's claims. Defendant Monsanto Company ("Monsanto") is a Delaware corporation headquartered in Missouri, as is defendant Solutia, Inc. ("Solutia"), a corporation Monsanto spun off in 1997. Plaintiff is an individual resident of New York.

Mr. Satterfield claims that the defendants tortiously converted his property by refusing to turn over stock in the defendant companies to which he is entitled because of his ancestors' ownership of stock in a predecessor company which became, by mergers, part of defendant corporations. He claims that this refusal constitutes a breach of defendants' fiduciary duties and of the covenant of good faith and fair dealing, that defendants made fraudulent representations to him regarding his present right to their stock, and that they conspired to deprive him of his stock interest. Finally, he demands punitive damages, as well as attorney's fees and costs.

### Background

In 1924 plaintiff's great-grandfather, Daniel Oldroyd ("Oldroyd"), purchased 50 shares of $1 par value stock in the E.L. Smith Oil Company ("Smith Oil"). Def.'s Ex. B–1. In 1928, the par value of Smith Oil stock was changed from $1 to $10 (Def.'s Ex. B–2), changing Oldroyd's holding in Smith Oil to five shares of $10 par value stock, although there is no evidence that he ever exchanged his 50 $1 par value shares for five $10 par value shares.

In 1938 Smith Oil merged with the Lion Oil Refining Company ("Lion Oil"). For every 10 shares of $10 par value Smith Oil stock surrendered, Lion Oil issued one share of its own stock:

Immediately upon this Merger Agreement becoming effective, each holder of capital stock of E.L. Smith Oil Company, Inc., other than Lion Oil Refining Company, upon surrender of certificates representing shares of stock of E.L. Smith Oil Company, Inc., in transferrable form, shall receive in exchange therefor one share of common capital stock of Lion Oil Refining Company, of no par value, for each ten shares of common capital stock of E.L. Smith Oil Company, Inc., of the par value $10.00 each, so surrendered for exchange for the common capital stock of Lion Oil Refining Company ...

Pl.'s Ex. 1 at Bates No. 0110.

Accordingly, the five Smith Oil shares to which Oldroyd was entitled amounted to one-half a share of Lion Oil common stock after the merger.

For those Smith Oil stockholders who had not converted their $1 par stock to $10 par stock, the merger agreement provided:

It is understood that there are outstanding certain shares of the common capital stock of E.L. Smith Oil Company, Inc., which are of the par value of One Dollar per share, issued prior to April 9, 1928, and that the holders thereof have heretofore been entitled to exchange ten shares of such common capital stock of E.L. Smith Oil Company, Inc., of the par value of $1.00 per share, for one share of the common capital stock of E.L. Smith Oil Company, Inc., of the par value of $10.00 per share, and upon presentation of any such common capital stock of E.L. Smith Oil Company, Inc., of the par value of One Dollar per share, in exchange for common capital stock of Lion Oil Refining Company, the holder thereof shall be entitled to one share of common capital stock of Lion Oil Refining Company for each one

hundred shares of such common capital stock of E.L. Smith Oil Company, Inc., of the par value of $1.00 ...

Pl.'s Ex. 1 at Bates Nos. 0111–12.

Under the provision the same result obtained: since Oldroyd had kept his 50 $1 par shares of Smith Oil, they were worth one-half a share of Lion Oil common stock after the merger.[1] In either event, Lion Oil would not issue such a fractional share of its own stock, but only scrip which could be aggregated with enough other scrip to be exchanged for full Lion Oil shares. As the merger agreement stated:

The Corporation shall not issue fractional shares of its common capital stock in exchange for the common capital stock of E.L. Smith Oil Company, Inc., under any circumstance, but if the holder of any common capital stock of E.L. Smith Oil Company, Inc., shall be entitled to a fractional part of a share of common stock in the Lion Oil Refining Company, in lieu of issuing the same, the Corporation will issue to such holder a Bearer Scrip Certificate for such fraction, which shall entitle the holder thereof, upon the surrender of the same with other Scrip Certificates, together aggregating one or more full shares, to exchange the same for a certificate representing the same number of full shares of common stock of Lion Oil Refining Company. Such Scrip Certificates shall not entitle the holder thereof to vote on any question, or to receive dividends upon the fraction of a share to which the holder is entitled by virtue thereof, and the holder of any such Scrip Certificate shall not be entitled, by virtue thereof, to the preemptive right to purchase any of the common capital stock of Lion Oil Refining Company, or Securities of that Company convertible into common stock of that Company, issued by that Compa-

---

1. Daniel Oldroyd died on May 8, 1928. Pl.'s Ex. 26. For purposes of this motion it is uncontested that all rights derived from Daniel Oldroyd's Smith Oil stock passed to his heirs, and are now vested in plaintiff Charles M. Satterfield, III.

ny subsequent to the issuance of such Script Certificates.

Pl.'s Ex. 1 at Bates No. 0111.

Thus the Smith Oil holders of Lion Oil scrip did not have rights as Lion Oil shareholders until (if ever) they assembled enough scrip to obtain one or more full Lion Oil shares. The face of the Lion scrip certificates bore the following notation:

This Scrip Certificate is not a Stock Certificate and the holder hereof is not a shareholder of Lion Oil Refining Company, is not entitled to vote at any meeting of the stockholders of that Company or to receive any dividends upon the fraction of a share to which the holder is entitled by virtue hereof; nor is the holder of this Scrip Certificate entitled to the preemptive right to purchase any of the Common Capital Stock of Lion Oil Refining Company, or securities of that Company convertible into Common Capital Stock of that Company, issued by the Company subsequent to the issuance of this Script Certificate.

Def.'s Ex. C at Bates No. 0006.

There is no evidence that Oldroyd's heirs ever attempted to assemble enough scrip to obtain one or more shares of Lion Oil stock, or made any tender to Lion Oil for such an exchange. Satterfield Depo. at 50–52. At the time of the Smith Oil/Lion Oil merger, Lion Oil thrice offered to buy "the old [Smith Oil] $1 par" at 85¢ per share, and the $10 par at $8.50 per share (the price at which the merger was consummated), without requiring conversion into the new Lion Oil shares. Thus, Oldroyd's Smith Oil shares could have been sold to Lion Oil for cash, or exchanged for scrip. Plaintiffs' predecessors did neither.

After the merger Lion Oil stock was split twice: a two-for-one stock split in 1947, and another two-for-one stock split in 1949. Pl.'s Ex. 1 at Bates No. 0118. These splits are significant, for they give rise to a crucial argument in the case: Mr. Satterfield claims that they doubled his rightful (although inchoate) one-half share interest in Lion Oil to one full share, and then doubled it again to two full shares. The defendants assert the splits did not extend to scrip.

In 1955, Lion Oil merged with Monsanto in a stock for stock merger. The merger agreement gave holders of Lion Oil shares which yielded fractional interests in Monsanto (at the conversion rate of one and one-half Monsanto shares for each share of Lion Oil) the right to receive Monsanto scrip. If sufficient scrip was accumulated it could be exchanged for shares of Monsanto common stock. Otherwise, it would be repurchased by Monsanto on market terms between 1957 and 1961. As stated in the merger agreement:

Under the terms of the proposed merger, the outstanding Capital Stocks of the Constituent Corporations will be converted into stock of the Surviving Corporation [Monsanto], as follows:

Capital Stock of Lion

For each share of Capital Stock, no par value—One and one-half shares of Common Stock, par value $2 per share, of the Surviving Corporation . . .

No certificates of stock evidencing fractional shares or interests in its Common Stock will be issued by the Surviving Corporation [Monsanto] in connection with the conversion of Lion Capital Stock, but there will be issued in lieu thereof scrip certificates representing rights in respect of such fractional shares. Such scrip shall not confer upon the holder any right to dividends or any voting or other rights of a stockholder of the Surviving Corporation, but the Surviving Corporation shall from time to time on or before November 1, 1957 issue, upon the surrender in proper form of scrip for fractional shares, one or more shares of its Common Stock aggregating the number of whole shares issuable in respect of the scrip so surrendered. Such scrip shall provide that at the option of the Surviving Corporation's Board of Directors, the Corporation may

sell at any time after November 1, 1957, in such manner and on such terms as the Board may determine, the number of shares of Common Stock of the Surviving Corporation [Monsanto] in respect of which such scrip certificates are then outstanding; and thereafter until November 1, 1961, the bearers of such scrip certificates, upon surrender, shall receive their proportion of the net proceeds of such sale, without interest, and after the date of such sale shall be entitled to no other rights with respect to said scrip certificates. After November 1, 1961, all such scrip certificates shall be void for all purposes and undistributed proceeds from the sale shall be retained by the Corporation as part of its general funds, free of any claim of those previously entitled thereto.

Pl.'s Ex. 1 at Bates No. 0017.

Oldroyd's heirs took no action during that time with respect to their old Smith Oil stock certificate.

In 1994, his grandfather gave Mr. Satterfield's mother the Smith Oil stock certificate, which she then gave to the plaintiff. Satterfield Depo. at 29. Until then, Oldroyd's family had retained the stock certificate as a family memento, and no one had tried to convert it to cash or to stock in any other corporation. Satterfield Depo. at 50–52.

His grandfather subsequently executed a document, on January 14, 1998, transferring to Mr. Satterfield "... all my right, title and interest in any and all stocks, bonds, warrants or any other financial instruments which were purchased by my father, Daniel Oldroyd, between the years of 1924 and 1928 ...." Def.'s Ex. B–10.

In September or October 1995, Mr. Satterfield first contacted Monsanto about converting his Smith Oil stock to shares of Monsanto. Satterfield Depo. at 54. Monsanto denied that he was entitled to any shares of the company by virtue of his ownership of Smith Oil stock (Def.'s Ex.

B–22 and B–23), and plaintiff filed this lawsuit.

Since all the corporations involved are (or were at the time of the transactions in question) Delaware corporations, the parties agree that Delaware law applies.

### The Parties' Arguments

Defendants argue that the scrip to which plaintiff was entitled by virtue of the merger of Smith Oil into Lion Oil gave him (if his ancestors had obtained it) no rights as a shareholder in Lion Oil. He was never a Lion Oil shareholder, and did not become one through splits in its stock, which only affected issued and outstanding shares of Lion Oil. Since plaintiff never became a stockholder of Lion Oil, its merger into Monsanto gave him no interest in Monsanto.[2]

Plaintiff argues that although Oldroyd's Smith Oil stock was equivalent to only a half a share of Lion Oil under the merger agreement, the 1947 and 1949 Lion Oil stock splits increased his ownership interest in Lion Oil to one share in 1947, and to two shares in 1949. Under the terms of Lion Oil's 1955 merger into Monsanto, those two Lion Oil shares yielded three shares of Monsanto, which have since increased in value to the amount of damages he claims.

Mr. Satterfield also points out that Monsanto assumed all of Lion Oil's liabilities, including its obligations owed to Smith Oil's stockholders, and that the 1955 merger agreement provided that "... 3,336 shares of Common Stock of the Surviving Corporation [Monsanto] will be reserved for issuance for shares of a former subsidiary of Lion." Pl.'s Ex. 1 at Bates No. 0018. Since the Smith Oil/Lion Oil merger agreement put no termination date on the ability of former Smith Oil stockholders to convert their Lion Oil scrip to Lion Oil shares, plaintiff contends that their right to do so still exists, and that Monsanto is liable, as

---

**2.** Defendants also urge that all plaintiff's claims are barred by statutes of limitations.

In view of the disposition on the merits, those arguments need not be addressed.

successor to Lion Oil, for delivery of the proceeds of those shares.

Mr. Satterfield's position thus depends on the concept that his rights as a shareholder survived the transactions between the three corporations.

### Discussion

It is common ground that at the time Smith Oil merged into Lion Oil, Oldroyd's shares in Smith Oil entitled him only to receive Lion Oil scrip, not Lion Oil shares. Indeed, the merger agreement stated that Lion Oil would not issue fractional shares "under any circumstances" (see Pl.'s Ex. 1 at Bates No. 0111).

The face of the scrip explicitly stated that its holders were not shareholders of Lion Oil: "This Scrip Certificate is not a Stock Certificate and the holder hereof is not a shareholder of Lion Oil Refining Company, is not entitled to vote at any meeting of the stockholders of that Company or to receive any dividends ..." Def.'s Ex. C, Monsanto Bates No. 0006.

Corporations are creatures of statutes, and the Delaware statute not only authorizes the use of scrip as was done in the Smith Oil merger, but makes clear that the scrip holder has no ownership interest in the corporation's assets cognizable upon liquidation:

A corporation may, but shall not be required to, issue fractions of a share. If it does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined or (3) issue scrip or warrants in registered form (either represented by a certificate or uncertificated) or in bearer form (represented by a certificate) which shall entitle the holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share. A certificate for a fractional share or an uncertificated fractional share shall, but scrip or warrants shall not unless otherwise provid-

ed therein, entitle the holder to exercise voting rights, to receive dividends thereon, and to participate in any of the assets of the corporation in the event of liquidation.

Del.Code Ann. tit. 8, § 155 (1999).

Oldroyd's heirs, considered as scrip holders, could sell the scrip at the pricerate offered to shareholders (which they did not do), but they could not become Lion Oil shareholders unless they aggregated their scrip with enough other scrip to amount to a whole share.

■ Since the scrip was not stock, it was not affected by the 1947 or 1949 splits of Lion Oil stock. A stock split, by definition, divides the outstanding shares of a corporation without altering any shareholder's interest. As stated by the Supreme Court of Delaware, "A stock split is a dividing up of the outstanding shares of a corporation into a greater number of units, without altering the stockholder's proportional ownership in the corporation." *Lynam v. Gallagher*, 526 A.2d 878, 882 (Del.1987).

Mr. Satterfield's argument that his scrip-holdings doubled (and later re-doubled) because of the stock splits is flawed in two respects. First, if the stock split allowed those who were merely scrip holders to become shareholders by operation of the stock split, the proportional ownership of the corporation would be altered, since new shares would be issued to the former scrip holders.

Second, a stock split divides only the outstanding shares of a corporation. "Delaware law, which is controlling under the terms of the Agreement, defines 'outstanding' stock as that which can be voted and therefore is 'construed to mean stock in the hands of shareholders, not stock in the treasury.'" *Nerken v. Standard Oil Company (Indiana)*, 810 F.2d 1230, 1232 (D.C.Cir.1987), citing *Atterbury v. Consolidated Coppermines Corp.*, 20 A.2d 743, 747 (Del.Ch.1941).

Since Oldroyd's heirs never had a sufficient ownership interest to amount to one share of Lion Oil stock (since their scrip, if they had obtained it, would be unaffected by the two-for-one stock splits), they never became entitled to be issued a single share of Monsanto stock.

Mr. Satterfield points to a footnote in the Lion Oil proxy statement describing the Monsanto merger, which states that "... 3,336 shares of common stock of [Monsanto] will be reserved for issuance of shares of a former subsidiary of Lion." Pl.'s Ex. 1 at Bates No. 0018.

But plaintiff gains no advantage from that provision because (accepting, as both parties do, that the "former subsidiary" is Smith Oil), his ancestors never assembled sufficient scrip to obtain either a Lion Oil or a Monsanto share.

Even if Mr. Satterfield's predecessors had obtained Monsanto scrip, their right to aggregate it and obtain Monsanto shares, or to sell it to Monsanto, expired in 1961. The merger agreement provided:

Such scrip shall not confer upon the holder any right to dividends, or any voting or other rights of a stockholder of the Surviving Corporation [Monsanto], but the Surviving Corporation shall from time to time on or before November 1, 1957 issue, upon the surrender in proper form of scrip for fractional shares, one or more shares of its Common Stock aggregating the number of whole shares issuable in respect of the scrip so surrendered. Such scrip shall provide that at the option of the Surviving Corporation's Board of Directors, the Corporation may sell at any time after November 1, 1957, in such manner and on such terms as the Board may determine, the number of shares of Common Stock of the Surviving Corporation in respect of which such scrip certificates are then outstanding; and thereafter until November 1, 1961, the bearers of such scrip certificates, upon surrender, shall receive their proportion of the net proceeds of such sale, without interest, and after the date of such sale shall be enti-

tled to no other rights with respect to said scrip certificates. After November 1, 1961, all such scrip certificates shall be void for all purposes and undistributed proceeds from the sale shall be retained by the Corporation as part of its general funds, free of any claim of those previously entitled thereto.

Pl.'s Ex. 1 at Bates No. 0017.

Delaware law specifically approves such an imposition of a cut-off date on the ability to convert scrip to shares or cash:

The board of directors may cause scrip or warrants to be issued subject to the conditions that they shall become void if not exchanged for certificates representing the full shares or uncertificated full shares before a specified date, or subject to the conditions that the shares for which scrip or warrants are exchangeable may be sold by the corporation and the proceeds thereof distributed to the holders of scrip or warrants, or subject to any other conditions which the board of directors may impose.

Del.Code Ann. tit. 8, § 155 (1999).

Finally, running through Mr. Satterfield's argument is the concept that as a stockholder in Smith Oil, Oldroyd possessed an inchoate but innate and immutable ownership interest of which he could not be deprived, and of which his shares, or scrip, were merely evidence—an interest which endured and became some interest in Monsanto.

But that concept founders and fails. The notion of such ownership is destroyed by the facts that the scrip stated that its holder "is not a shareholder of Lion Oil" and that Delaware law gives scrip holders no interest in the corporate assets on its liquidation. As stated above, corporations are creatures of statute law, and under Delaware law such minority interests as Oldroyd's may be eliminated:

It is equally settled under Delaware law that minority stock interests may be eliminated by merger. And, where a merger of corporations is permitted by

law, a shareholder's preferential rights are subject to defeasance. Stockholders are charged with knowledge of this possibility at the time they acquire their shares.

*Rothschild Int'l Corp. v. Liggett Group, Inc.*, 474 A.2d 133, 136–37 (Del.1984). See also, *Shields v. Shields*, 498 A.2d 161, 168 (Del.Ch.1985) ("The fact that a merger may have the effect of eliminating a class of corporate securities and thus legally mooting an unexercised power with respect to such securities is neither shocking nor novel.").

### Conclusion

Since all of plaintiff's claims depend upon his being a shareholder of Monsanto, which he is not, defendants' motion for summary judgment is granted.

The Clerk will enter judgment dismissing the complaint, with costs and disbursements to defendants according to law.

So ordered.